**Mario BERTOLINO, Plaintiff,**

v.

**ITALIAN LINE, Defendant.**

**No. 72 Civ. 2981.**

United States District Court, S. D. New York.

May 6, 1976.

Milton Kean, New York City, for plaintiff; Floyd S. Weil, Paul H. Kean, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant; Joseph F. Ryan, Jr., Bruce C. Beringer, New York City, of counsel.

IRVING BEN COOPER, District Judge.

Defendant Italian Line moves to dismiss plaintiff's complaint pursuant to Fed.R. Civ.P. 41. Plaintiff Bertolino commenced this diversity, non-jury action in July 1972 after proper removal from the Supreme Court, State of New York. Plaintiff seeks damages for statutory and common law copyright infringement, also for conversion by defendant. In his complaint plaintiff claims damages of $815,000.

The trial started March 1 and ended March 3, 1976. At the close of plaintiff's direct case, we directed both sides to submit memoranda of law, appropriate exhibits and extracts from the depositions of witnesses in order to focus exclusively on the

issue of whether plaintiff had satisfied the burden of presenting a prima facie case. (Tr. 269–71)[1]

## I

Bertolino is an international opera singer who has performed at La Scala in Milan, the Royal Opera in Rome and at Covent Garden, London. He has also appeared on several well-known television shows and at resorts in Las Vegas and Miami Beach. (Tr. 4–10)

## II

Beginning in 1969, under the supervision and direction of Sara and Myron Wiegand, Bertolino embarked on a project primarily to produce phonograph records. His agreement to participate in this venture was memorialized in a contract dated June 28, 1969. (Deft.Exh. A) In substance, it provided that plaintiff would produce not less than sixty compositions, perform two personal concerts at New York's Carnegie Hall and in Pittsburgh, and receive approximately 2.7% of the retail selling price of all phonograph records made and sold from the master recordings produced under the contract. Further, Mr. Wiegand agreed to underwrite the production of the records to the extent of $170,000. In return, the Wiegands were given the right to supervise production of the recordings, direct where the net profits from personal appearances would be distributed, and receive weekly from Bertolino an accounting of his finances. Most important of all the contractual provisions was clause 2:

"2. You hereby agree that we, MYRON WIEGAND and SARA WIEGAND, shall be the exclusive owners of all right, title, interest in and to said master recordings, free of any claim whatsoever by you."

Pursuant to this contract, Bertolino eventually produced 72 songs on seven long-playing and one short-playing records.

Plaintiff testified he made 25 or 30 copies of each of these "master discs." Each record had a gold-printed label pasted on it which contained the following admonition: "All rights of the manufacturer and of owner of the recorded work reserved. Unauthorized public performance, broadcast and copying of this record prohibited. Made in Italy." (Tr. 11–22)

The particular "mix" or confluence of the singer's voice and orchestral accompaniment on the records emphasized the orchestral track and thus tended to drown out plaintiff's voice. (Tr. 23–28)

On May 6, 1971 Bertolino set sail aboard defendant's vessel LEONARDO DA VINCI ("LEONARDO") under an agreement which in substance provided that plaintiff would perform one concert aboard the LEONARDO in consideration for free passage and reduced laundry and bar rates. (Tr. 27–30) Shortly before his concert performance, Bertolino testified, he was approached by one Antonio Grassi, who then was in charge of presenting taped music and motion pictures aboard the LEONARDO. After being praised by Mr. Grassi, the singer testified he presented him with a complimentary set of his recordings—copies of the eight master discs. (Pltf.Exhs. 1–8; Tr. 30–31)

Bertolino then allegedly said to Mr. Grassi

" 'Look, I want to tell you one thing. For you this should be a collector's item, only for you because this [sic] are not to be played for the public so you will play for you and your wife and that's it.'

So he [Mr. Grassi] thanked me, he almost kissed me, he almost hugged me.' " (Tr. 31)

Plaintiff also distributed copies of the eight master discs to several other passengers and to the crew. (Grassi deposition, pp. 23–25)[2]

---

1. The following notation system will be employed in this opinion: "Tr." followed by a number refers to the official trial record; "Pltf. Exh." and "Deft. Exh." refer to plaintiff's and defendant's exhibits, respectively.

2. At the close of trial we reserved decision on the admissibility of Mr. Grassi's deposition. (Tr. 268) Since both sides have stipulated to its admissibility and because the deposition is

Upon arrival in Italy, Bertolino called at the Italian Line office where he met Mr. Grassi and Messrs. Caruba, Bruno and De Barbieri, executives of the Italian Line. Plaintiff asked whether there was a possibility that his records could be taped so that they could be played over public address systems on Italian Line vessels:

"Bertolino said that he would be pleased if tapes including the sound recordings of his songs would be played on Italian Line ships. I (Bruno) said that the Italian Line had no objection to his sound recordings being inserted into the tapes but that it was not up to me to decide. . .

Nothing, absolutely nothing, was said by anyone present with regard to payment of money or other compensation to Mario Bertolino for the playing of tapes featuring him on Italian Line ship or ships." (Bruno Answers to Depo. on Written Questions, numbers 10(b) and (c))

Mr. Grassi outlined his recollection of the meeting:

"I, before my three superiors and Mr. Bertolino said to my superiors whether we could tape the records on tape, always in the presence of Mr. Bertolino. Then my superiors in view of the fact that I had said that he sang so well and that they were beautiful songs, because I am telling the truth, my superiors said that we would indeed tape those records, and Mr. Bertolino said yes." (Bertolino deposition, p. 37)

At the meeting, plaintiff negotiated a return trip aboard defendant's vessel RAFFAELO, which left Italy for New York in early June, 1971. Plaintiff's return trip was covered by an employment agreement similar to that which he entered into aboard the LEONARDO.

clearly relevant here, it is admitted in its entirety. Fed.R.Evi. 804(b)(1).

**3.** The eight records given Mr. Grassi by plaintiff—pltf. exhs. 1 through 8—are copies of the

## III

The instant litigation was precipitated by an event which occurred one night in June, 1971, while at a cocktail party aboard the RAFFAELO. Plaintiff heard one of his songs emanating from the ship's public address system. Realizing that this song was one of the 72 contained on the eight records given Grassi, Bertolino became infuriated. At trial plaintiff estimated that 30 of his 72 songs were played during the balance of the journey to New York. (Tr. 37–44; 127–40; 154–58; 203–08)

Upon his return to New York in July 1971 plaintiff spoke to a Mr. Arena, purser aboard the RAFFAELO, at the Italian Line office in New York. Plaintiff complained about the unauthorized playing of his songs aboard the RAFFAELO. Mr. Arena instructed plaintiff to contact the general manager of Italian Line in the United States. Bertolino testified he unsuccessfully attempted to contact the manager on six occasions. (Tr. 55–59; 247–50; 262–64)

In September 1971 Bertolino and his cousin Franco Balistreri heatedly confronted Mr. Grassi at a New York pier. Plaintiff told the latter that his unauthorized playing of plaintiff's songs had jeopardized the singer's career since the particular mix on the records overwhelmed his voice. Mr. Grassi allegedly ran away. (Tr. 46–54)

## IV

On cross-examination of Bertolino during trial numerous significant disparities of astonishing proportions arose regarding plaintiff's version of principal events. For one, in his pre-trial deposition plaintiff testified that he had no written contracts with Sara Wiegand. On cross-examination it was brought out that plaintiff had a written contract dated June 28, 1969 with both Sara and Myron Wiegand. (Tr. 74–78; Deft. Exh. A)

For another, plaintiff contended on direct that he was producer and owner of the eight master discs.[3] During cross-examina-

master discs produced pursuant to the 1969 contract and contain the same 72 songs. (Tr. 28, 31)

tion it was elicited from Bertolino that Sara and Myron Wiegand in fact are the exclusive owners of all right, title and interest in the master recordings free of any claims whatsoever by plaintiff. (Tr. 81–83; Deft. Exh. A)

Further, Bertolino testified at his deposition in 1973 that the only people who had given money to him for the production of sound recordings that are the subject matter of this action were Sara Wiegand, Mr. Balistreri, Mr. Mulach, Filippo Bertolino, Mr. Volpe and no one else. In fact, as Bertolino's trial cross-examination revealed, Myron Wiegand had given plaintiff $219,-000 for production of those recordings. (Tr. 90–98)

Still further, as to payment of income taxes by him, Bertolino testified that his wife paid income tax on the $5,250 that was paid to her in 1969 from the checking account in the name of plaintiff and Sara Wiegand. Plaintiff filed joint tax returns with his wife for the years 1969 and 1970 (Deft.Exh. C); neither he nor his wife declared the $5,250 as income. (Tr. 112–25)

Furthermore, plaintiff testified on direct that he made 25 to 30 pressings of the master discs in Italy. During his cross examination he revealed that the pressings of the records were in fact made by Raleigh Record Company in New York City and that in July 1970 plaintiff himself directly ordered from Raleigh 700 copies of the pressings and in January 1972 an additional 400 pressings. (Tr. 236–39)

Another inconsistency surrounded the circumstances foreclosing plaintiff from selling his records when he arrived in Italy in May, 1971. At his deposition in 1973 Bertolino stated he did not attempt to sell the records in Italy because of his mother's heart condition. At trial plaintiff testified that he had to delay the sale of records because his father had a heart attack. (Pltf's deposition, p. 227; Tr. 33)

A further discrepancy encircled plaintiff's allegations of owning copyrights on seven of the 72 songs contained on the records given to Mr. Grassi. Plaintiff introduced in evidence a list of the 72 song titles that appear on the eight records given to Grassi. (Pltf.Exh. 17) The song titles on plaintiff's certificates of copyright are: "Dammi un Bacio," "Viva La Sicilia," "L'inverno Passera," "I Won't Remember You," "A Man Needs a Woman," "Lonely," and "Do it Now." (Pltf.Exhs. 10–16) An examination of the songs on plaintiff's recordings and list of song titles of these recordings demonstrates that only three[4] of the seven songs appear both on the records and the list of song titles.

We found particularly disturbing Bertolino's inability to account for the large sums of money advanced him in the past to aid him in his production of records. Bertolino received a total of $389,000 to $429,000 from Sara and Myron Wiegand, Mr. Mulach, Mr. Balistreri, Mr. Volpe and Mr. Filippo Bertolino. (Tr. 92–97; 182–85) Although plaintiff paid everything by check,[5] the cancelled checks demonstrate that Bertolino spent only $158,797.26.[6] No cancelled check was offered at trial showing that Bertolino either refunded money to any of his benefactors or paid federal income tax on the amounts received.[7] The difference between the amounts received ($429,000) and the amounts spent (approximately $158,800) by Bertolino is likewise unaccounted for.

Finally, there was a direct contradiction between plaintiff's and Grassi's testimony regarding the gift of the records. As noted *supra,* plaintiff testified that he gave the records to Mr. Grassi upon the express condition that the recipient would use them only for the private entertainment of his

---

**4.** The three are: "Dammi un Bacio," "Viva La Sicilia," "L'inverno Passera."

**5.** Plaintiff's deposition, p. 123.

**6.** The $158,797.26 consists of $115,017.22 in cancelled checks from Bertolino's joint account with Mrs. Wiegand and $43,780.04 in cancelled checks from his own account. (Tr. 105; 178–82)

**7.** Deft.Exh. C.

wife and himself. In direct contrast, Mr. Grassi stated in his deposition.

"Q. Did Mr. Bertolino ever give you any of his recordings?

A. Yes.

Q. Would you tell us the circumstances under which he gave these recordings to you?

A. He gave me these recordings as a gift so that I could make tapes, tape recordings, but I told him that I could not make any such tapes without being authorized to do so by the company.

\* \* \* \* \* \*

Q. Did Mr. Bertolino tell you that these songs were for your own private use and that they were not to be played in front of the public?

A. He did not say to me that they were to be used only for my private use.

Q. Did he say that you were not supposed to play these records over the vessel's loudspeaker system?

A. He said nothing to me." (Grassi Deposition, pp. 19, 22)

## V

■ Fed.R.Civ.P. 41(b) provides that a defendant in a case tried to the Court may move for dismissal at the close of the plaintiff's evidence on the ground that upon the facts and the law the plaintiff has shown no right to relief. In rendering judgment the Court is not to make any special inferences in plaintiff's favor. *Emerson Electric Co. v. Farmer,* 427 F.2d 1082 (5th Cir. 1970); Wright & Miller, *Fed.Practice & Procedure: Civil § 2371.* Rather, the Court is to "weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." Wright & Miller, *supra,* § 2371, at p. 225. Applying that standard here, we have determined, especially in view of the unconvincing nature of plaintiff's own testimony, that defendant's motion to dismiss the plaintiff's complaint should be granted in all respects.

Actually plaintiff has no standing under the copyright laws to advance this suit; his pendent claims of destruction of bailment and defendant's conversion are completely without merit.

■ In a suit under the copyright laws it is axiomatic that only the proprietor of the copyright has standing to sue for its infringement. *Manning v. Miller Music Corp.,* 174 F.Supp. 192 (S.D.N.Y.1959); *Greenbie v. Noble,* 151 F.Supp. 45 (S.D.N.Y. 1957); *Nimmer on Copyright, § 132.* An examination of defendant's exhibit A, the June 28, 1969 contract between Bertolino and the Wiegands, makes it crystal clear that the latter have exclusive right and title to any property interests, including copyright, in the recordings.

The agreement called for plaintiff to devote his services exclusively to producing 60 recordings and to make designated appearances. Most importantly, however, the Wiegands directed, underwrote and supervised production of the recordings and specified how the profits would be distributed. See, *Scherr v. Universal Match Corp.,* 417 F.2d 497 (2d Cir. 1969). Under such a contract, Bertolino had no property rights because he reserved none. Judge Swan made the point in *Yardley v. Houghton Mifflin Co.,* 108 F.2d 28, 30 (2d Cir. 1939):

"When an artist accepts a commission to paint a picture for another to pay, he sells not only the picture but also the right to reproduce copies thereof unless the copyright is reserved to the artist by the terms, express or implicit, of the contract . . . . ."

■ Here, as in *Yardley,* there was "no evidence from which such a reservation could be inferred." *Id.*

In *Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565 (2d Cir. 1966) the Court stated:

"[T]here is a presumption in the absence of an express contractual reservation to the contrary, that the copyright shall be in the person at whose instance and expense the work is done." *Id.,* at 567.

Clearly no express contractual reservation exists in Bertolino's favor.

■ Under common law an artist who agrees to sell his work contracts away his

common law rights unless he reserves them by the terms of the contract. *Pushman v. New York Graphic Society,* 287 N.Y. 302, 39 N.E.2d 249 (1942); see *Nimmer, supra* at §§ 62–63.

Not only was there no reservation by plaintiff of any property rights; overpowering is clause 2 of the agreement which explicitly grants all title, claim and interest in the recordings to the Wiegands.

## VI

Plaintiff attempts to avoid the effects of this crucial shortcoming by making three allegations. First, that standing is unimportant at this stage since we are solely concerned at this juncture with liability and standing relates solely to damages. Second, even if plaintiff had no property rights under copyright law, he has standing as a bailee. Third, even if plaintiff has no standing as a bailee, plaintiff still rightfully possessed property which was impermissibly converted by defendant. We categorically reject these arguments.

■ The first argument is completely without merit. It is elementary that standing is a threshold requirement that must be demonstrated throughout the proceedings. Wright, *Law of Federal Courts, § 14.* In a copyright action a party must manifest an economic interest from the inception of the action in order to justify the exercise of federal judicial power. *Nimmer, supra* at § 132. Here we have concluded that plaintiff does not possess such economic interest.

■ The second argument is also without merit. We note at the outset that plaintiff's allegations of bailment were made for the first time in his post-trial brief. Plaintiff's complaint makes no mention of his bailor-bailee relationship with the Wiegands. We note further that plaintiff was served with interrogatories by defendant in January 1974. Two interrogatories demanded of plaintiff the nature of his rights in the sound recordings. In answer to these interrogatories plaintiff claimed he was the owner of all the recordings. At no time did plaintiff allege that the Wiegands gave him

the records as a bailment. Even assuming *arguendo* that such an allegation was made before trial, there was not one shred of evidence at trial that plaintiff was in fact a bailee.

■ A bailment is delivery of personal property for a particular purpose on express or implied contract with the understanding that it will be redelivered to the person leaving it or that it will be kept until he reclaims it after the fulfillment of the purpose for which it was delivered. *Lash v. Knapp,* 143 N.Y.S.2d 516 (Sup.Ct.1955). There was a complete absence of evidence at trial of an express or implied contract between the Wiegands and plaintiff. Indeed, if there was such a contract, plaintiff violated its terms by freely dispensing copies of the recordings.

Finally, we reject the third argument by which he advances the doctrine of conversion. We base this conclusion in large measure on our assessment of the deposition testimony submitted by the defendant and our estimation of plaintiff's credibility. The testimony of Messrs. Bruno and De Barbieri regarding the summer 1971 meeting at the Genoa Italian Line office was succinct and convincing. Their testimony was not challenged on cross-examination.

## VII

■ We also find Mr. Grassi's deposition testimony to be credible and persuasive particularly as to the summer 1971 meeting at the Genoa Italian Line office and Bertolino's alleged request that Mr. Grassi play plaintiff's records only for his private entertainment. In short, we find believable Mr. Grassi's version that plaintiff did try to persuade him to tape and play the eight records.

We are constrained to, and do, emphasize our estimation of plaintiff's unconvincing proof. His performance as a witness was unconvincing. Indeed we believe he was unreliable as to matters both large and small. Applying the criteria, endorsed in law, by which truth is determined (for example, hereinabove we pointed to discrepancies of a startling and irreconcilable na-

ture), the burden of proof assessed and other imperatives long recognized, we are forced to the conclusion that plaintiff has irreparably failed to even approach a prima facie case. In sum, the totality of plaintiff's proof was severely deficient qualitatively and quantitatively, under any theory of law.

In a non-jury case the Court possesses the wide power of determining the facts and where the truth lies. *Palmentere v. Campbell,* 344 F.2d 234 (8th Cir. 1965). As Judge Duffy put it:

"District Judges are charged with the responsibility of determining credibility of witnesses because our court system recognizes that the signs of credibility are more than just those found in a cold record." *United States v. Tramunti,* 377 F.Supp. 1 (S.D.N.Y.1974)

## VIII

Accordingly, because we have concluded that the totality of plaintiff's proof falls short of a prima facie case on the facts and law, we grant defendant's motion to dismiss the complaint.

Motion granted in all respects.

This opinion shall constitute our findings of fact and conclusions of law, pursuant to Fed.Rules Civ.P. 41(b) and 52(a).

SO ORDERED.