**Mickey ROONEY, on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**COLUMBIA PICTURES INDUSTRIES, INC.; Metro-Goldwyn-Mayer, Inc.; Paramount Pictures Corp.; RKO General, Inc.; Twentieth Century-Fox Film Corp.; United Artists Corp.; Universal City Studios, Inc.; and Warner Bros. Inc., Defendants.**

**No. 81 Civ. 3877 (WCC).**

United States District Court, S. D. New York.

April 19, 1982.

---

Berger & Montague, P. C., Philadelphia, Pa., for plaintiff; David Berger, H. Laddie Montague, Jr., Robert Simon Balter, Howard L. Langer, Philadelphia, Pa., Richard E. Bennett, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants Columbia Pictures Industries, Inc., Metro-Goldwyn-Mayer, Inc., Paramount Pictures Corp., Twentieth Century-Fox Film Corp., and Universal City Studios, Inc; Roy L. Reardon, David E. Massengill, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants United Artists Corp. and Warner Bros. Inc.; Gerald F. Phillips, New York City, of counsel.

Regan, Goldfarb, Heller, Wetzler & Quinn, New York City for defendant RKO General, Inc.; Harry E. Youtt, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff Mickey Rooney ("Rooney") brings this action on behalf of himself and a purported class consisting of all performers in motion picture films produced by defendants or their predecessors and affiliates, the principal photography of which films was completed prior to February 1, 1960 ("pre-1960 Films"). Defendants, eight major producers or distributors of motion picture films, have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, Rule 12(b)(6), F.R. Civ.P., or alternatively for summary judg-

ment, Rule 56, F.R.Civ.P. Rooney has also moved, pursuant to Rule 23, F.R.Civ.P., for certification of the above-defined class with himself as its representative. For the reasons that follow, defendants' motion for summary judgment is granted and the action is dismissed.[1]

The complaint is in four counts. Count One alleges a conspiracy in restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Specifically, Rooney claims that, beginning at least as early as July 1, 1977, defendants conspired among themselves and with unnamed others to refuse to deal with Rooney regarding his "publicity rights" in pre-1960 films, with the purpose and effect of commercially exploiting such rights in the commercial television, pay television and audiovisual device markets, as well as in connection with the sale of merchandise[2] (collectively "alternative markets"), all without compensating Rooney for such exploitation.

Count Two alleges that defendants "wrongfully have received and continue to receive all of the profits from their commercial exploitation of the intangible property rights owned by plaintiff and the members of the class."

Count Three claims that defendants have violated the Lanham Act, 15 U.S.C. § 1125(a), by falsely representing (1) that pre–1960 films made for exhibition in movie theatres could be commercially exploited in the alternative markets, and (2) that use of pre–1960 films in the alternative markets was sponsored, endorsed or approved by Rooney and the members of the purported class.

Count Four alleges that defendants "have by their acts of unfair competition misappropriated the names, likenesses, images, pictures, goodwill, reputations and valuable property rights of plaintiff and the members of the class . . . ."

The common premise underlying each of these claims is the contention of Rooney that defendants, while having secured the rights to exhibit pre-1960 films containing Rooney performances in movie theatres, did not acquire the rights to exhibit such films in the alternative markets. It is because I find this premise to be incorrect on the basis of the undisputed or uncontroverted facts of record that I grant defendants' motion for summary judgment. The basis for my conclusion requires a summary of the contractual relationships between Rooney and each of the defendants.

### 1. Metro-Goldwyn-Mayer, Inc. ("MGM")

On August 29, 1933, Rooney signed a contract with MGM to act in the "photoplay" "Fire Chief" (this contract will hereafter be referred to as "MGM 1"). Then thirteen years old, Rooney was paid $300 per week. The contract provided at paragraph 4 that

"[t]he term 'photoplay' as used in this agreement shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production. The producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the artist's acts, poses, plays and appearances of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the artist's voice, and all instrumental, musical, and other sound effects produced

---

1. The granting of the motion for summary judgment dismissing Rooney's claims precludes certification of a class represented by Rooney, since he is an inadequate representative of any performers with valid claims, see, *e.g., East Texas Motor Freight v. Rodriguez*, 431 U.S.

395, 403–04, 97 S.Ct. 1891, 1896–97, 52 L.Ed.2d 453 (1977).

2. Apparently the argument is that the exhibition of the pre-1960 films on commercial television is a use of the films in connection with the sale of merchandise.

by the artist in connection with such acts, poses, plays and appearances. The producer shall likewise have the right to use and give publicity to the artist's name and likeness, photographic or otherwise, and to recordations and reproduction of the artist's voice and all instrumental, musical, and other sound effects produced by the artist hereunder, in connection with the advertising and exploitation of said photoplay. The rights in this paragraph granted to the producer shall inure to the benefit not only of the producer, but also to the benefit of all persons who may hereafter acquire from the producer any right to distribute, transmit, exhibit, advertise, or exploit said photoplay."

On March 29, 1934, Rooney signed a contract with MGM to act in the "photoplay" "Three Men" for $300 per week ("MGM 2"). MGM's rights in the "photoplay" were defined in the same broad terms quoted above from MGM 1.

On August 22, 1934, Rooney signed an exclusive services contract with MGM ("MGM 3"). Under this contract, in paragraph 2, Rooney agreed

". . . that he will render his services as a radio performer, not only by broadcasting in person, but also by making electrical transcriptions and/or by any other present or future methods or means; that he will render his services as an actor in television productions; and that he will render his services in connection with the broadcasting and/or transmission of his likeness and/or voice by means of television, radio and/or otherwise, whether such broadcasting and/or transmission be either directly or indirectly in connection with or independent of photoplays."

The contract further provided in paragraph 4 that

"[t]he artist expressly gives and grants to the producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances of any and all kinds during the term hereof, and to record his

voice and all instrumental, musical and other sound effects produced by him, and to reproduce and/or transmit the same, either separately or in conjunction with such acts, poses, plays and appearances, as the producer may desire; and further gives and grants to the producer solely and exclusively all rights of every kind and character whatsoever in and to the same, or any of them, perpetually, including as well the perpetual right to use the name of the artist and pictures or other reproductions of the artist's physical likeness, and recordations and reproductions of the artist's voice, in connection with the advertising and exploitation thereof, as well as in connection with the advertising and/or exploitation of any other services which may be required of the artist hereunder."

On November 6, 1937, August 8, 1940 and February 16, 1945, Rooney executed new exclusive services contracts with MGM ("MGM 4," "MGM 5" and "MGM 6," respectively). With one exception not relevant here,[3] MGM's rights in Rooney's performances were defined by provisions identical to those quoted above from MGM 3. These contracts also included television transmissions and exhibitions within the definition of "photoplay." Rooney's salary under these contracts grew to $2,500 per week, plus frequent and substantial bonuses.

On June 25, 1948, Rooney bought his way out of his exclusive contract with MGM. The contract embodying that agreement ("MGM 7") provided that Rooney released MGM from any claims he might have had against MGM. Paragraph 1 of the contract further provided:

"Notwithstanding anything herein set forth, nothing herein contained is intended or shall be construed as a waiver or surrender by us [MGM] of any right of ownership in or to any photoplays heretofore produced in whole or in part by us with your [Rooney's] assistance; or of the right to produce or reproduce in any manner whatsoever your pictures and photo-

---

**3.** MGM 6 limited MGM's rights to Rooney's services as a radio performer to advertising or exploitation of photoplays in which Rooney had appeared or would appear.

graphs and/or recordations and/or reproductions of your voice and/or of all instrumental, musical and other sound effects heretofore made for us by you; or of any right whatsoever to exhibit, release, produce, reproduce or otherwise deal in or with respect to the foregoing, or any of them, or any right of ownership or control heretofore acquired by us in and to any and all work heretofore done by you for us during your employment by us; or of the full benefit of any and all representations, warranties and indemnities heretofore made by you in our favor, or of our right, or the right of our licensees, to use your name and/or photographs and/or recordings and/or reproductions of your voice for advertising and publicity purposes in connection with work heretofore done by you for us; it being distinctly understood and agreed that we do hereby expressly reserve to ourselves all of the rights and privileges in this sentence referred to."

As part of this arrangement, on that same date of June 25, 1948, Rooney signed a short-term exclusive services contract ("MGM 8") and a multiple picture agreement ("MGM 9") with MGM. MGM's rights in Rooney's performances under MGM 8 were governed by language identical to that appearing in MGM 6. MGM 9 provided at paragraph 5 that

"[t]he producer shall have the right to photograph and/or otherwise reproduce any and all of the acts, poses, plays and appearances of the artist of any and all kinds during each employment period and to record the voice of the artist and all instrumental, musical and other sound effects produced by him and to reproduce and/or transmit such photographs and recordings either separately or in conjunction with such acts, poses, plays and appearances as the producer may desire and the producer shall own, fully and exclusively, all rights of every kind and character whatsoever in and to such photographs and recordings, perpetually, including the right to use all or any part of them in any photoplay or photoplays as the producer may desire."

On January 8, 1952, Rooney and MGM terminated MGM 8 and MGM 9 by a written agreement ("MGM 10"). MGM 10 contained releases by both parties as to any claims arising out of MGM 8 and MGM 9. MGM 10 also included a reservation-of-rights clause materially identical to that quoted above from MGM 7.

On January 8, 1952, Rooney and MGM executed a contract covering the photoplay "A Slight Case of Larceny" ("MGM 11"). Paragraph 11 of that contract provided:

"We [MGM] shall have the right to photograph you [Rooney] and your performances, and thereby or otherwise to reproduce your likeness and any and all of your acts, poses, plays and appearances of any and all kinds hereunder, by any present or future methods or means, and the right to record your voice and all instrumental, musical and other sound effects produced by you hereunder, and to reproduce and/or transmit the same, either separately or in conjunction with such acts, poses, plays and appearances as aforesaid, as we may desire. We (and our successors and assigns) shall be entitled to and shall own solely, exclusively and perpetually, all rights of every kind in and to all of the foregoing, and in and to all other results and proceeds of your services hereunder, without restriction or limitation of any kind, including (but not limited to) the sole, exclusive and perpetual right to reproduce and rerecord all or any of said photographs, reproductions and recordations, by any present or future methods or means, and to perform, exhibit and reproduce said photographs, recordings and reproductions or any of them at any time or times, either separately or in combination, in and in connection with said photoplay and otherwise, and in combination with photographs, recordations and reproductions of or made by any other person or persons. You hereby transfer and assign to us all of the results and proceeds of your services hereunder, and all rights therein, including but not being limited to, the rights specified above, without reservation, condition or limitation of any kind."

Three additional contracts ("MGM 12," "MGM 13" and "MGM 14") were entered into between MGM and Fryman Enterprises ("Fryman") on January 21, 1958, January 14, 1959 and September 25, 1959, covering Rooney's performances in the films "Andy Hardy Comes Home," "The Big Operator" and "Platinum High School," respectively. Fryman was a corporation formed by Rooney and its principal asset was Rooney's services. Each of MGM 12, MGM 13 and MGM 14 provided:

"We [Fryman] further warrant and represent that our said agreement with Mr. Rooney provides that we own and are entitled to all rights of every kind and character, exclusively and perpetually in and to all of the results and proceeds of his services and that we have the perpetual right to use, and to allow others to use his name and pictures, photographs and other reproductions of his likeness, and recordations and reproductions of his voice and of the instrumental, musical and other sound effects produced by him, in and in connection with the advertising and exploitation of said photoplays."

In MGM 12, Rooney further specified:

"I hereby acknowledge and confirm the fact that FRYMAN ENTERPRISES, INC., has the right to furnish my services as hereinabove set forth and I specifically agree for your [MGM] benefit that I will perform the services herein referred to and that, in connection with the advertising and exploitation of said photoplay, you will have the same rights in and to the results and proceeds of my services and in and to the use of my name, voice and likeness as I have heretofore granted to FRYMAN ENTERPRISES, INC."

Correspondingly, MGM 13 and MGM 14 provided:

"... we [Fryman] agree that you [MGM] shall own and we hereby assign, transfer and set over to you, your successors and assigns, all such rights in and with respect to all services rendered by the Artist in connection with said photoplay."

2. Columbia Pictures Industries, Inc. ("Columbia").

On November 1, 1949, Rooney signed a contract ("Columbia 1") with Columbia for the photoplay then tentatively entitled "Freddie the Great." Rooney was paid $100,000 for that film. Sections IV-1 and IV-2 of Columbia 1 provided:

"The Artist grants to the Corporation the sole and exclusive right to photograph or otherwise reproduce all or any part of the Artist's performances, acts, poses, plays and appearances of every kind and nature made or done by the Artist in connection with the picture; to record or otherwise reproduce his voice and all musical, instrumental or other sound effects produced by him in connection with the picture; to reproduce and transmit the same either separately or in conjunction with such performances, acts, poses, plays and appearances as the Corporation may desire, and perpetually to exhibit, transmit and reproduce, and license others to exhibit, transmit and reproduce (whether by means of motion pictures, radio, television, televised motion pictures, printing, or any other means now known or unknown) any of such reproductions in connection with the picture, or the advertising or exploitation of the picture."

\*     \*     \*     \*     \*     \*

"The Artist grants to the Corporation the perpetual but nonexclusive right to use, and to license others to use his name and reproductions of his physical likeness and reproductions of his voice, such use to be for the purpose of advertising or exploiting the picture."

On August 10, 1950, Rooney and Columbia executed a three-picture contract ("Columbia 2"), under which Rooney was to receive fixed sums and a share of the profits of the three films, including television revenues. As to Columbia's rights to use the films in alternative markets, Columbia 2 contained paragraphs materially indistinguishable from the above-quoted provisions from Columbia 1.

By letter agreement dated February 22, 1957, ("Columbia 3") Rooney, in exchange for $30,000, transferred to Columbia

" . . . all of [his] right, title, and interest in and to any and all monies remaining payable to [him] pursuant to said employment agreement of August 10, 1950, as heretofore modified and amended, for the motion pictures SOUND OFF, ALL ASHORE, and DRIVE A CROOKED ROAD, including but not limited to any and all monies derived from the exhibition of said motion pictures by means of television."

On March 22, 1957, Rooney contracted to appear in the Columbia photoplay "Operation Madball" for a weekly salary of $12,500 ("Columbia 4"). Columbia 4 incorporated by reference a schedule of contract terms contained in the 1952 Collective Bargaining Agreement between the Screen Actors Guild ("SAG" or "the Guild") and several movie producers. Section 30 of Schedule C, incorporated by reference, provided:

"RIGHTS GRANTED TO PRODUCER

"The term 'photoplay' as used in said free lance contract shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices, including television, which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production. The Producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the player's acts, poses, plays and appearances of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the player's voice, and all instrumental, musical, and other sound effects produced by the player in connection with such acts, poses, plays and appearances. The Producer shall likewise have the right to use and give publicity to the player's name and likeness, photographic or otherwise, and to recordations and reproductions of the player's voice and all instrumental, musical, and other sound effects produced by the player hereunder, in connection with the advertising and exploitation of said photoplay. The rights in this section granted to the Producer shall inure to the benefit not only of the Producer, but also to the benefit of all persons who may hereafter acquire from the Producer any right to distribute, transmit, exhibit, advertise, or exploit said photoplay."

3. Twentieth Century-Fox Film Corp. ("Fox").

Rooney acted in only three pre-1960 movies produced by Fox. The first two were made while Rooney was under exclusive contract to MGM, and Rooney's services were "loaned" by MGM to Fox. It is not disputed that the assignment of rights provision in MGM 3, quoted above, applied respectively to Rooney and Fox in connection with these films.

The third movie, tentatively titled, "A Nice Little Bank that Should Be Robbed," was the subject of a January 13, 1958 contract between Fox and Fryman ("Fox 1"). Fox provided at paragraph 8:

"In addition to the services rendered hereunder, we [Fox] shall be entitled to and own all of the results and proceeds thereof (including, but not limited to, all rights throughout the world, of production, manufacture, recordation and reproduction by any art or method, including television and/or radio broadcasting, and of copyright, trademark and patent) whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical or any other form of works, themes, ideas, compositions, creations or products. We shall also acquire under this agreement all of the rights generally known in the field of literary and musical endeavor as the 'moral rights of authors'."

The terms of Fox were expressly consented to in writing by Rooney.

## 4. Universal City Studios, Inc. ("Universal")

Rooney appeared in two pre-1960 films produced by Universal. The first was "Francis Goes to the Haunted House," pursuant to a February 7, 1956 contract ("Universal 1"). Universal 1 provided at paragraph 7:

"We [Universal] shall have the right to photograph and/or otherwise reproduce any and all of your [Rooney] acts, poses, plays and appearances hereunder, to record your voice and all instrumental, musical and other sound effects produced by you, and to reproduce and/or transmit such photographs and recordings, either separately or together, as we may desire in connection with said photoplay. We shall own all rights of every kind and character whatsoever in and to all such photographs and recordings, and all other results and proceeds of your services hereunder perpetually, including, but not limited to, the right to use all or any part thereof in or in connection with said photoplay and the advertising and exploitation thereof and/or otherwise as we may desire in connection with said photoplay.

\*　　\*　　\*　　\*　　\*　　\*

"We shall also have the perpetual right to use your name, voice and likeness on the positive prints of and in connection with the advertising and exploitation of said photoplay and all of the photographs, recordings and other results and proceeds of your services hereunder."

Section 2 of Universal 1 further provided that

"[t]he word 'photoplays,' as used herein, includes, but it not limited to, motion pictures produced, exhibited with and/or accompanied by sound and/or voice recording, reproducing and/or transmitting devices, radio devices, television devices and all other improvements and devices which are now or may hereafter be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture productions."

The second film in which Rooney appeared for Universal was "The Private Lives of Adam and Eve," pursuant to a June 3, 1959 contract between Universal and Fryman ("Universal 2"). Paragraph 13 of Universal 2 provided:

"In addition to the artist's services hereunder, you [Universal] shall be entitled to and shall own all of the results and proceeds thereof (including all rights throughout the world of production, manufacture, recordation and reproduction by any art or method, copyright, trademark and patent) whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical or any other form of works, scenes, ideas, compositions, creations or products. Specifically, and without in any way limiting the generality of the foregoing, we [Fryman] expressly give and grant to you all rights of every kind and character in and to any and all acts, poses, plays and appearances of any and all kinds which the artist may write, suggest, direct or produce during the term hereof. You shall further have the right to photograph and/or otherwise reproduce any and all of the artist's acts, poses, plays and appearances hereunder, to record the artist's voice and all instrumental, musical and other sound effects produced by the artist, and to reproduce and/or transmit such photographs and recordings, either separately or together, as you may desire. You shall own all rights of every kind and character whatsoever in and to all such photographs and recordings, and all other results and proceeds of the artist's services hereunder, perpetually including, but not limited to, the right to use all or any part thereof in or in connection with said photoplay and the advertising and exploitation thereof.

\*　　\*　　\*　　\*　　\*　　\*

"We hereby assign and transfer to you all rights of every kind and character in and to all of the foregoing without reservation, condition or limitation."

Rooney consented in writing to the terms of Universal 2.

5. Warner Bros. Inc. ("Warner").

On November 7, 1932, Rooney agreed to act in the Warner photoplay originally entitled "The Sucker" for $300 per week ("Warner 1"). The contract provided at paragraph 4:

"The term 'photoplay' as used in this agreement shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production. The producer shall have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the artist's acts, poses, plays and appearances of any and all kinds hereunder, and shall further have the right to record, reproduce, transmit, exhibit, distribute, and exploit in connection with said photoplay the artist's voice, and all instrumental, musical, and other sound effects produced by the artist in connection with such acts, poses, plays and appearances. The producer shall likewise have the right to use and give publicity to the artist's name and likeness, photographic or otherwise, and to recordations and reproductions of the artist's voice and all instrumental, musical, and other sound effects produced by the artist hereunder, in connection with the advertising and exploitation of said photoplay. The rights in this paragraph granted to the producer shall inure to the benefit not only of the producer, but also to the benefit of all persons who may hereafter acquire from the producer any right to distribute, transmit, exhibit, advertise, or exploit said photoplay."

On July 12, 1933, Rooney signed an identical contract to act in the movie "The World Changes" ("Warner 2").

On October 19, 1934, Warner "borrowed" Rooney's services from MGM for the film "Midsummer Night's Dream," and thus acquired MGM's rights under MGM's exclusive services contract with Rooney (MGM 3). Similarly, on April 23, 1936, Warner "borrowed" Rooney's services from MGM for the movie "Blood Line."

6. United Artists Corp. ("UA").

UA does not produce films, but rather finances and distributes movies produced by others. UA has distributed six pre-1960 Rooney films. As to three of these—"Little Pal," "Quick Sand" and "My Outlaw Brother"—UA has not been able to discover contracts between Rooney and their producers. However, UA's right to distribute these films expired prior to 1960, and thus Rooney could have no claim against UA within the limitations periods of his various causes of action.

As previously mentioned, the movie "Midsummer Night's Dream" was produced by Warner in 1936 while Rooney was under contract to MGM (MGM 3). A UA subsidiary acquired the film rights in 1956 from a corporation which had in turn acquired the rights from Warner.

"Baby Face Nelson" was produced by a joint venture consisting of Fryman and Z-S Productions. On July 25, 1957, UA acquired

"the sole, exclusive and irrevocable right, license and privilege, under copyright and otherwise, to rent, lease, license, exhibit, distribute, re-issue and otherwise deal in and with respect to the Picture . . . .

"The rights herein granted, without limiting the generality of the foregoing, shall include all so-called 'theatrical' as well as 'nontheatrical' rights in the Picture (as those terms are commonly understood in the motion picture industry) and shall include the right to use film of any and all guages, and the right to project, exhibit, reproduce, transmit and perform, and authorize and license others to project, exhibit, reproduce, transmit and perform the Picture and prints and trailers thereof by television and by any other scientific, mechanical or electronic means, method or device now known or hereafter conceived or created." ("UA 1").

UA 1 at ¶ 10.

The record in this case also includes Rooney's prior contractual assignment to the joint venture of "the right, in connection with this motion picture, to use your [Rooney] name, voice, [and] likeness in connection with the exploitation and publicizing of the said motion picture." UA's rights under UA 1 expired in 1967.

Finally, "The Last Mile" was produced by R. S. Productions, Inc. ("RS") pursuant to a 1958 contract between RS and Fryman ("RS1"), paragraph 8 of which provided:

"Producer shall have the right to photograph and/or otherwise produce and reproduce, any and all of the Artist's acts, poses, plays and appearances hereunder, to record the Artist's voice and all instrumental, musical and other sound effects produced by the Artist or otherwise, and to reproduce, transmit, exhibit, exploit, and/or otherwise turn to account such photographs and recordings, either separately or together, as the Producer may desire in connection with the motion picture or the exploitation thereof, including by means of television or by any other means or device whether now or hereafter known or devised. Producer shall own, solely and exclusively in perpetuity, all rights of every kind, character and nature in and to all such photographs and all other results and proceeds of the Artist's services hereunder (including, but not limited to, all rights throughout the world, of production, manufacture, distribution, exhibition, advertising, exploitation, recordation and reproduction by any art or method, whether now or hereafter known or devised, as Producer may desire), whether such results and proceeds consist of literary, dramatic, musical, motion picture, mechanical, or any other form of works, themes, ideas, compositions, creations, or products. Producer shall also acquire and is hereby granted under this agreement all of the rights generally known in the field of literary and musical endeavor as the 'moral rights of authors'."

Rooney separately confirmed the grant to RS "of all rights of every kind, nature and character in and to my services, the rights in and to the photoplay contemplated to be produced thereunder, and all the results and proceeds of the photoplay."

7. RKO General, Inc. ("RKO").

Rooney made no film for RKO.

8. Paramount Pictures Corp. ("Paramount").

On November 5, 1951, Rooney contracted to act in the Paramount production initially titled "The Military Policeman" ("Paramount 1"). Section "Seventh" of Paramount 1 provided:

"The Artist hereby grants to the Corporation the right to use the Artist's name, photograph, likeness and any simulation of any thereof, and to record, reproduce, amplify and simulate the Artist's voice and appearance, by mechanical and/or electrical means, in and in connection with said motion picture photoplay, and in advertising, exploiting and/or exhibiting the same and in connection with commercial advertising and publicity tie-ups which also serve to advertise and exploit said photoplay; provided, however, that no such commercial advertising shall contain any endorsement by the Artist without the Artist's written consent first had and obtained. The Corporation shall have the exclusive right to issue publicity concerning the Artist with respect to said photoplay."

On November 10, 1953, Rooney contracted to act in the Paramount production "The Bridges at Toko-Ri" ("Paramount 2"). Paragraph "Seventh" at Paramount 2 provided:

"The Artist hereby grants to the Corporation the right to use the Artist's name, photograph, likeness and any simulation of any thereof, and to record, reproduce, amplify and simulate the Artist's voice and appearance, by any means: in and in connection with said photoplay, and in advertising, publicizing, exploiting and exhibiting the same in any manner; and in and in connection with commercial

advertising tie-ups and commercial publicity tie-ups which also serve to advertise, publicize, exploit and promote the exhibition of said photoplay, provided that no such tie-ups shall contain any express endorsement by the Artist without the Artist's written consent first had and obtained. The Corporation shall have the exclusive right to issue publicity concerning the Artist with respect to said photoplay."

### 9. Collective Bargaining Agreements

SAG was organized in 1933 and, since at least as early as 1948, has been the exclusive bargaining representative for motion picture actors. Rooney has been a member of SAG since 1937. SAG By-Laws provide that "[e]very member of the Guild shall be bound by the provisions of all collective bargaining contracts in effect between the Guild and motion picture producers as the same are or may hereafter be amended."

On April 18, 1960, SAG executed a collective bargaining agreement ("SAG 1") with several motion picture producers, including Columbia, MGM, Paramount, Fox and Warner. SAG 1 was preceded by a month-long strike by SAG, the principal grievance of SAG having been its demand for a share of television revenues.

Pursuant to SAG 1, the producers paid $2,625,000 to establish a pension plan and a health and welfare plan, and agreed to make further contributions to such plans. The producers further agreed to pay SAG 6% of the net television revenues for films made after February 1, 1960 which were released to free television.

In return, SAG agreed that:

"[a]s to all theatrical motion pictures, the principal photography of which commenced prior to February 1, 1960, the Guild does not and will not make any claim for compensation for the exhibition of such motion pictures on television."
SAG 1 at Section 3.

SAG 1 further provided that a clause in prior agreements reserving "the right of any actor to assert any claims which he may have against any person, firm, or corporation as to any film or the use thereof" would be "cancelled and deleted." *Id.* Finally, SAG 1 provided that its provisions governing payments to actors included the exhibition of the films on pay television.

"This agreement sets forth all of the minimum wage scales and working conditions for all players (including actors, singers, stunt men, and airplane pilots, but excluding extras) employed in motion pictures produced for theatrical exhibition. For the purpose of this agreement 'theatrical exhibition' shall be deemed to include any form of pay television."
SAG 1 at Section 4.

A press release issued jointly by SAG and the producers reported:

"In the interest of the industry's future, such important accommodations were made for this contract as the actors' relinquishment of any claim on post-'48 films released to television, their agreement to recognize pay television as an extension of the theatrical box office, and the forgoing [sic] by the producers, for this contract, of non-payment for exhibition on free television of theatrical films which have not returned their cost."

In 1967, SAG and several producers (including Columbia, MGM, Paramount, Fox, Universal and Warner) entered into another collective bargaining agreement ("SAG 2"). The above-quoted provisions from SAG 1 also appear at Sections 7 and 8 of SAG 2.

In 1971, SAG and the producers (including all defendants but RKO and UA) executed a supplement to SAG 2 ("SAG 3"). Section 7 of SAG 3 contained the same release language as to the television exhibition of pre-1960 films. SAG 3 provided that actors would share in revenues from the exhibition of post-June 30, 1971 films in "supplemental markets." Section 5(B) of SAG 3 defined "supplemental markets" as

"the exhibition of theatrical motion pictures by means of cassettes (to the limited extent provided in paragraph (1) of this subsection B), pay-type CATV, or Pay Television, as those terms are hereafter defined in this subsection B.

"(1) Cassettes: For the purposes of this Agreement, a cassette is any audio-visual device, including without limitation, cassette, cartridge phonogram or other similar audio-visual device now known or hereafter devised, containing a theatrical motion picture (recorded on film, disc, tapes or other material) and designed for replay on a home-type television screen. The sale or rental of cassettes for replay on a home-type television screen in the home constitutes the 'Supplemental Market' for the purposes of this Agreement, insofar [as] cassettes are concerned.

"(2) Pay-Type CATV: Exhibition of theatrical motion pictures on home-type television screens by means of transmission by a community antenna television system (CATV where, in addition to the obligatory general cable charge to the subscriber for the CATV service: (i) a further charge is made for programs selected by the subscriber, or (ii) the subscriber has the option, by making payment, in addition to the standard subscription charge, to receive special programming over one or more channels which are not available to the subscriber without such additional payment.

"(3) Pay Television: Exhibition of theatrical motion pictures on a home-type television screen by means of telecast, cable or closed circuit in which the viewing audience pays to receive the program by making a separate payment for such specific program. Exhibitions in theatres or comparable places by means of telecast or cable is theatrical exhibition and shall not be considered Pay Television.

"The term 'Supplemental Markets' does not include the exhibition of a theatrical motion picture by cassette or otherwise over a television broadcast station or in theatrical exhibition, and for this purpose 'theatrical exhibition' includes the educational market, the exhibition of theatrical motion pictures on any commercial carrier (referred to herein as 'In-Flight'), such as commercial airlines, trains, ships and buses, and other uses which have been traditionally considered theatrical exhibition of theatrical motion pictures, other than the specific home use hereinabove defined as the 'Supplemental Market' for cassettes.

"Wherever reference is made in this Agreement to pay-type CATV or Pay Television, such reference shall be deemed to include only those uses of theatrical motion pictures as to which a charge is actually made to the subscriber for the program viewed, or where the subscriber has the option, by additional payment, to receive special programming over one or more special channels. Where no program charge or special channel charge is made to the subscriber in addition to the general charge, the transmission of theatrical motion pictures by the CATV or television facility, including programming originated by the CATV or television facility, is free television exhibition for the purposes of this Agreement, and such exhibition shall not be considered Supplemental Markets exhibition.

"The Producers have agreed to the inclusion of pay-type CATV and Pay Television in the 'Supplemental Markets' because under the present pattern of distribution of theatrical motion pictures, pay-type CATV and Pay Television are supplemental to the primary theatrical market. The Producers reserve the right in future negotiations to contend that the pattern of release has changed so that pay-type CATV and/or Pay Television are no longer a Supplemental Market but constitute or are a part of the primary market of distribution of theatrical motion pictures, and that therefore no additional payment should be made with respect to the release of theatrical motion pictures (including those covered by this Agreement) in said markets. Nothing herein shall limit the scope of negotiations on said subject."

In 1977, SAG and the producers (including Columbia, MGM, Fox and Warner) executed another collective bargaining agreement ("SAG 4"), which contained the same release as to pre-1960 films and which con-

tinued the SAG 3 agreement as to "supplemental markets."

## DISCUSSION

██ Under California law,[4] the determination of whether a written contract is ambiguous is a question of law that must be decided by the court. *Brobeck, Pleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

It is difficult to conceive of contracts which more explicitly and certainly provide the answer to the major issue before this Court than the above-recounted contracts between Rooney and defendants. These agreements make clear that the rights to exhibit Rooney's pre-1960 films in the alternative markets are held by defendants and not by Rooney.[5]

MGM 1 and MGM 2 gave MGM the right to exhibit the films "with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production," and further provided that MGM shall "have the right to photograph and/or otherwise produce, reproduce, transmit, exhibit, distribute, and exploit in connection with the said photoplay any and all of the artist's acts, poses, plays and appearances of any and all kinds hereunder."

MGM 3, MGM 4, MGM 5, MGM 6 and MGM 8 specifically included Rooney's services "in connection with the broadcasting and/or transmission of his likeness and/or voice by means of television, radio and/or otherwise, whether such broadcasting and/or transmission be either directly or indirectly in connection with or independent of photoplays," and further provided that MGM shall have "solely and exclusively all rights of every kind and character whatsoever in and to the [photoplays]."

MGM 7 and MGM 10 reaffirmed MGM's right to "produce or reproduce" the photoplays "in any manner whatsoever."

MGM 9 specified that MGM "shall own, fully and exclusively, all rights of every kind and character whatsoever in and to such [photoplays]."

MGM 11 provided for MGM's ownership of "all rights of every kind ... without restriction or limitation of any kind," and for MGM's right "to perform, exhibit and reproduce" the photoplay "by any present or future methods or means."

MGM 12, MGM 13 and MGM 14 transferred to MGM "all rights of every kind and character."

Columbia 1 and Columbia 2 gave Columbia the perpetual right "to exhibit, transmit and reproduce ... (whether by means of motion pictures, radio, television, televised motion pictures, printing, or any other means now known or unknown) any of such reproductions in connection with the picture, or the advertising or exploitation of the picture."

Columbia 4 provided for Columbia's right "to record, reproduce, transmit, exhibit, distribute and exploit" the photoplay, including "motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and

4. It appears that California law governs state law rights in this action. Applying New York choice of law rules, it is California that has the greatest interest in the interpretation and consequences of the subject contracts. Rooney was a California resident throughout his pre-1960 acting career. The contracts were signed in California and were for the most part performed in California.

5. Rooney on this motion does not dispute that these contracts cover all of the movies made by defendants in which Rooney appeared. The complaint does allege that Rooney began his career in a 1922 film produced by an unnamed predecessor of Fox, but the affidavit of Fox's record custodian indicates that no record of such a movie produced by Fox or either of its predecessors exists. Rooney has not controverted this affidavit or otherwise submitted any evidence as to this 1922 film allegedly produced by a predecessor of Fox, see Rule 56(e), F.R. Civ.P., or even indicated that his claims in this action are based in any part on this film.

devices, including television, which may now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production."

Fox 1 gave Fox "all rights . . . of production, manufacture, recordation and reproduction by any art or method, including television and/or radio broadcasting. . . ."

Universal 1 provided that Universal could "reproduce and/or transmit" . . . "as we [Universal] may desire," and would "own all rights of every kind and character whatsoever in and to all such photographs and recordings. . . ."

Universal 2 granted Universal "all rights . . . of production, manufacture, recordation and reproduction by any art or method, . . ." and "all rights of every kind and character . . . without reservation, condition or limitation."

Warner 1 and Warner 2 gave Warner the unqualified right to "produce, reproduce, transmit, exhibit, distribute, and exploit" the photoplay, including "motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices which are now or may hereafter be used in connection with the production and/or exhibition and/or transmission of any present or future kind of motion picture production."

UA 1 provided for the rights, " 'theatrical' as well as 'nontheatrical,' . . . to project, exhibit, reproduce, transmit and perform . . . by television and by any other scientific, mechanical or electronic means, method or device now known or hereafter conceived or created."

RS 1 provided for the right "to reproduce, transmit, exhibit, [and] exploit . . . [the photoplay] . . . as the Producer may desire . . ., including by means of television or by any other means or device whether now or hereafter known or devised."

Paramount 1 gave Paramount "the right . . . to record, reproduce, amplify and simulate the Artist's voice and appearance, by mechanical and/or electrical means, in and in connection with said motion picture photoplay. . . ."

Paramount 2 gave Paramount "the right . . . to record, reproduce, amplify and simulate the Artist's voice and appearance, by any means. . . ."

These contracts clearly and unambiguously granted to defendants all rights in connection with the pre-1960 films in which Rooney appeared, including the right to use such films in the alternative markets. The case law fully supports this conclusion.

In *Republic Pictures Corp. v. Rogers*, 213 F.2d 662 (9th Cir.), *cert. denied*, 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954), Roy Rogers sought to enjoin certain motion picture companies from distributing or licensing the exhibition on television of films in which Rogers appeared. The relevant portions of two contracts provided:

"The artist expressly gives and grants to the producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances * * * during the term hereof * * *; and further gives and grants to the producer solely and exclusively all rights of every kind and character whatsoever in and to the same, or any of them, perpetually, including as well the perpetual right to use the name of the artist and pictures or other reproductions of the artist's physical likeness, and recordations and reproductions of the artist's voice, in connection with the advertising and exploitation * * *. The artist does also hereby grant to the producer, during the term hereof, the sole and exclusive right to make use of, and to allow others to make use of, his name for advertising, commercial and/or publicity purposes (other than in connection with the acts, poses, plays and appearances of the artist hereunder), as well as the sole and exclusive right to make use of and distribute * * * his pictures, photographs or other reproductions of his physical likeness and or his voice for like purposes,"

and

"(A) The Artist hereby grants to Producer the sole and exclusive right to his

services for motion picture purposes during the term hereof * * * to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances * * * and to record his voice and all instrumental, musical and other sound effects produced by him * * *. The Artist also grants to the Producer, solely and exclusively, all rights of every kind and character whatsoever in and to all such photographs, reproductions and recordings and all other results and proceeds of his services hereunder, perpetually, and also the perpetual right to use the Artist's name and pictures or other reproductions of his physical likeness and recordations and reproductions of his voice, in connection with the advertising and exploitation thereof * * *.

"(B) For the purpose of advertising the photoplays to be produced hereunder, and subject to the reservations set forth in Subparagraph (C) of this Paragraph 4, the Artist also hereby grants to the Producer the right, during the term hereof, to use and/or authorize the use of his name and/or likeness in so-called 'commercial advertising,' to wit, advertising relating to products other than motion pictures, [subject to a number of limitations.]

"(C) The Artist reserves to himself the right to enter into any and all commercial tie-ups for products of every kind or character (other than motion pictures) * * *."

The district court granted the injunction; the Ninth Circuit reversed and remanded with directions to enter judgment for the defendants. The court held that the contracts gave defendants an "unlimited grant" to use Roger's "acts, poses, plays and appearances," including exhibition on television and in connection with commercial advertising. *Id.* at 666. The court found that the limitations of subparagraph (C) of the second contract applied only to the use of the artist's "name, voice and likeness" in advertising other than by reproducing the photoplay. *Id.*

In *Autry v. Republic Productions, Inc.,* 213 F.2d 667 (9th Cir.), *cert. denied,* 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed.2d 676 (1954), Gene Autry sought a similar injunction against television exhibition of movies in which he appeared. The relevant contracts provided:

"The producer shall have the right to photograph and/or otherwise reproduce any and all of the acts, poses, plays and appearances of the artist * * * during each employment period, and to record for motion picture purposes the voice of the artist * * * and to reproduce and/or transmit the same in connection with such acts, poses, plays and appearances as the producer may desire, and the producer shall own solely and exclusively all rights of every kind and character whatsoever in and to the same perpetually, including the right to use and exploit all or any part of the same in such manner as the producer may desire, and including, as well, the perpetual right to use the name and likeness of the artist and recordations and reproductions of his voice in connection with the advertising and exploitation thereof. The artist does hereby also grant to the producer the right to make use of and to allow others to make use of his name (in addition to and other than in connection with the acts, poses, plays and appearances of the artist hereunder) for the purpose of advertising, exploiting and/or publicizing photoplays in which the artist appears, as well as the right to make use of and distribute his physical likeness and his voice for the like purpose. * * *."

The district court ruled in favor of the defendants, and the court of appeals affirmed for the reasons set forth in *Rogers, supra.* See also *Bartsch v. Metro-Goldwyn-Mayer, Inc.,* 391 F.2d 150 (2d Cir.) (assignment of right "to copyright, vend, license and exhibit such motion picture photoplays throughout the world" includes the right to license a broadcaster to exhibit the motion picture on television), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); *L. C. Page & Co. v. Fox Film Corp.,* 83 F.2d 196, 199 (2d Cir. 1936) (grant of "exclusive moving picture rights" included right to "talkies" even though such technical improve-

ment may have been unknown and not within contemplation of parties at time of grant); *Landon v. Twentieth Century-Fox Film Corp.*, 384 F.Supp. 450 (S.D.N.Y.1974) (broad grant of motion picture rights includes television rights); *Wexley v. KTTV, Inc.*, 108 F.Supp. 558, 559 (S.D.Calif.1952) (grant of " . . . sole and exclusive right throughout the world to . . . exhibit . . . motion picture versions of the said dramatic composition . . . in any manner and method now or any time hereafter ever known or made available . . ." includes the right to televise motion pictures), *aff'd*, 220 F.2d 438 (9th Cir. 1955); *Hellman v. Samuel Goldwyn Productions*, 26 N.Y.2d 175, 309 N.Y.S.2d 180, 181, 257 N.E.2d 634, 635 (Ct. App.1970) (grant of right "to make, exhibit and market" motion pictures "using any methods or devices for such purposes which are now or hereafter known or used" includes right to exhibit on television, even though development of television as medium not foreseen when contract made); 3 Nimmer on Copyright, § 10.10[B] (1981).

Rooney's efforts to avoid the clear meaning of these consequences are many and various, sharing only the common characteristic of being unpersuasive.

*First*, Rooney contends that there exists an issue of fact as to whether the contracts are authentic. The sole basis for that contention is paragraph 15 of Rooney's affidavit, which recites:

> "My inspection of defendants' collected exhibits to the Motion For Summary Judgment creates significant doubts on my part as to the authenticity of the contracts defendants say I signed or ratified. In particular, many of these documents appear incomplete in that the pages or part of the pages appear to be missing."

Rooney also contends that an issue of fact exists as to the possible existence of parol agreements collateral to the written contracts. He does not, however, aver that such agreements were made or state that any such agreements are relevant to the issues here.

Both arguments are frivolous. The record contains affidavits from the relevant custodians of defendants' records that the submitted contracts are accurate and complete copies of any relevant contracts. The contracts each have numbered pages and paragraphs, and there do not appear to be any missing pages or parts of pages. Each of the contracts appears to have been duly executed. As for Rooney's vague and subjective "significant doubts" as to the authenticity and completeness of the documents, a well-supported motion for summary judgment such as the instant motion may be defeated only by the existence of issues of fact which appear *on the record*, not merely in the imagination of a party. See Rule 56(e), F.R.Civ.P. And as for Rooney's "parol evidence" claim, simply to assert that, as with any contract, there *might* have been parol agreements (without stating that in fact such agreements were actually made) can hardly be a basis for denying summary judgment; to rule otherwise would mean that summary judgment could never be granted on the basis of a written contract.

*Second*, Rooney advances various implausible constructions of several of the contracts in an attempt to avoid their plain meaning. As to that portion of MGM 2 which provides:

> "The term 'photoplay' as used in this agreement shall be deemed to include motion pictures produced and/or exhibited with sound and voice recording, reproducing and/or transmitting devices, radio devices, and all other improvements and devices which are now or may hereafter be used in connection with the production and; or exhibition and/or transmission of any present or future kind of motion picture production,"

Rooney contends that the entire phrase "recording, reproducing and/or transmitting devices, radio devices" refers back to "sound and voice." In other words, Rooney suggests the following structural reading:

> "The term 'photoplay' as used in this agreement shall be deemed to include motion pictures produced and/or exhibited with sound and voice:

"(1) recording, reproducing and transmitting devices,

"(2) radio devices,

. . ."

While it is not clear how such a construction would aid Rooney, it is clear that his reading of the sentence is incorrect. If each of the items numbered (1) and (2) above were intended to refer back to "sound and voice," one would expect the clause to read "sound and voice recording, reproducing and transmitting devices [and sound and voice] radio devices," or at least "sound and voice recording, reproducing and transmitting devices [and] radio devices," but not "sound and voice recording, reproducing and transmitting devices, radio devices." Plainly the comma between "devices" and "radio" was intended to set off the phrases on either side and refer each back to the first part of the sentence, as follows:

"The term 'photoplay' as used in this agreement shall be deemed to include motion pictures produced and/or exhibited with:

"(1) sound and voice recording, reproducing and transmitting devices,

"(2) radio devices,

and (3) all other improvements and devices . . . ."

Rooney also argues that the phrase "all other improvements and devices . . ." must be read as "all other improvements than sound and voice." While the Court sees no reason so to qualify this clause, even accepting Rooney's construction, there appears no reason why commercial and pay television and audio-visual devices are not "other improvements than sound and voice."

As to the contracts which specifically grant defendants the right to "exhibit" pre-1960 films by "television," Rooney argues (1) that "television" *might have been* intended only as a means to distribute movies to motion picture theatres and not to broadcast into individual homes, and (2) that "exhibition" means exhibition to a large mass of people and does not encompass individuals playing the film back on their individual playback devices. Each of these arguments strains credulity to such an extent that

merely to state the arguments is to refute them. The subject contracts unambiguously, and in the broadest possible language, provide that defendants will have all rights of exhibition and transmission by any means or medium whatever. The limitations which Rooney seeks to impose have no basis in fact or reason, and involve nothing less than an attempt to rewrite the contracts to produce a result entirely inconsistent with their plain meaning. See, *e.g.,* *Bartsch*, 391 F.2d at 154 ("'Exhibit' means to 'display' or to 'show' by any method, and nothing in the rest of the grant sufficiently reveals a contrary intention.").

Rooney further suggests that it is an issue of fact whether clauses in certain contracts prohibiting "commercial tie-ups" without Rooney's consent apply to commercial television. For example, Universal 1 provided:

"We [Universal] shall not have the right to use either your [Rooney] name or photograph in the endorsement of any product or service in any so-called 'commercial tie-up' advertising without your prior written consent, but the foregoing shall not, of course, limit our right to advertise, exploit or publicize said photoplay in any manner we may desire where such advertising, exploiting or publicizing is not connected with any such endorsement by you."

This clause must be read in connection with a prior portion of the contract, which provided:

"We [Universal] shall have the right to photograph and/or otherwise reproduce any and all of your [Rooney] acts, poses, plays and appearances hereunder, to record your voice and all instrumental, musical and other sound effects produced by you, and to reproduce and/or transmit such photographs and recordings, either separately or together, as we may desire in connection with said photoplay. We shall own all rights of every kind and character whatsoever in and to all such photographs and reordings, and all other results and proceeds of your services hereunder perpetually, including, but not

limited to, the right to use all or any part thereof in or in connection with said photoplay and the advertising and exploitation thereof and/or otherwise as we may desire in connection with said photoplay.

\* \* \* \* \* \*

"We shall also have the perpetual right to use your name, voice and likeness on the positive prints of and in connection with the advertising and exploitation of said photoplay and all of the photographs, recordings and other results and proceeds of your services hereunder."

Universal 1, like the other contracts containing a "commercial tie-up" clause, was executed when commercial television was well known to the parties.

Read in its entirety, the contract mandates the rejection of Rooney's position. The contract granted Universal "all rights of every kind and character whatsoever" in the exploitation of the photoplay, language certainly encompassing exhibition on commercial television. And the "commercial tie-up" provision expressly provided that it was not to be construed to limit such rights. Plainly the clause relied upon by Rooney referred to the use of Rooney's name or photograph in the direct endorsement of a product or service, not to the mere periodic interruption of the exhibition of the photoplay by advertisements unrelated to Rooney.

Finally, Rooney argues that, even assuming the contracts grant to defendants the rights to "exhibit" the movies on television, they do not cover the "sale" of the films by videocassettes and videodiscs. The contention is not persuasive. The contracts in question gave defendants extremely broad rights in the distribution and exhibition of pre-1960 films, plainly intending that such rights would be without limitation unless otherwise specified and further indicating that future technological advances in methods of reproduction, transmission and exhibition would inure to the benefit of defendants. The contracts generally do not limit defendants' right to "exhibition" of the films, but also convey the rights of "recording," "reproducing," "transmitting," and "exploiting." Thus there is little basis for Rooney's proposed distinction between immediate exhibition of the film by television and the sale of videocassettes for home exhibition. In any event, given the uniformly expansive nature of defendants' rights in the contracts, no reason appears why the word "exhibit" should be given such a restricted construction. As defendants point out, whether the exhibition apparatus is a home videocassette player or a television station's broadcast transmitter, the films are "exhibited" as images on home television screens.

*Third*, Rooney seeks to avoid the contracts by conclusorily denominating them contracts of adhesion. That unsupported accusation does not, on this record, provide a basis for denying summary judgment on the unambiguous provisions of the contracts. The mere fact that many of the contracts were standardized form contracts is not a reason to deny their enforcement. *E.g., Dart Industries Co., Inc. v. Westwood Chemical Co., Inc.*, 649 F.2d 646, 648–49 (9th Cir. 1980). Nor is there any other reason for denying enforcement of the contracts. Rooney received substantial salaries and bonuses under the contracts. He was frequently represented in negotiations by experienced agents including, on some occasions, his own corporation. The *minimum* terms of Rooney's contracts from 1932 through 1940 were the product of collective bargaining negotiations. And MGM 5, not unrepresentative of the contracts in relevant part, was specifically approved as "fair and equitable" by the California Superior Court. *In the Matter of the Contract between Loew's Inc. and Mickey McGuire*, No. 455476 (L.A.Co. Aug. 29, 1940). In short, nothing on this record indicates a factual basis for Rooney's allegation that his contracts are ones of adhesion.

*Fourth*, Rooney claims that his "release" of any rights under the contracts—specifically MGM 7 and MGM 10—were ineffective because Rooney did not anticipate the development of some or all of the alternative markets. He relies upon California Civil Code § 1542, which provides:

"A general release does not extend to claims which the creditor does not know

or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

The argument is wholly without merit for two reasons. First, the contracts in question were not general releases, but rather related to the exploitation of specific films, and thus Section 1542 has no application here. Second, the producers took care to provide that their rights would not be limited to exclude unforeseen technological advances, since the contracts granted them rights of exploitation "by any means," "by other improvements and devices which are now or may hereafter be used," "by any present or future method or means" and similar language. Where, as here, a party has acquired a contractual right which may fairly be read as extending to media developed thereafter, the other party can hardly avoid the contract's application to such media by establishing that the precise nature of the advance was not anticipated.[6]

*Fifth,* Rooney contends that literal performance of the contracts should be excused because of changed circumstances. The fatality in this argument is that there is no further performance by Rooney to excuse; Rooney's performance under the pre-1960 contracts ended long before this action. Accordingly, this is not a case of changed circumstances rendering performance impossible or impracticable. Rather this is at most a case involving circumstances so changed that the deal looks less attractive now than when struck. A contract cannot be avoided on that ground.

*Sixth,* Rooney argues that the contracts are illegal and cannot be enforced because they were the product of an antitrust conspiracy among defendants, apparently formed prior to 1930. He claims that defendants conspired to retain all rights to proceeds from the exhibition of the photoplays. Rooney, perhaps in recognition of the substantial statute of limitations obstacle to a 1981 lawsuit based on a conspiracy

allegedly existing back in the 1930's and 1940's, makes clear that such allegation of an antiquated conspiracy is not intended to be the basis for a cause of action for damages, but rather is offered solely as a "defense" to the contracts upon which defendants rely in seeking summary judgment.

Defendants strenuously argue that Rooney has offered no evidence of such a conspiracy sufficient to avoid summary judgment. The Court need not pass upon this issue, however, for I am persuaded by defendants' alternative contention that even if such a conspiracy were proved it would not provide Rooney with a basis for avoiding the contracts.

■ "As a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor ...." *Kelly v. Kosuga,* 358 U.S. 516, 518, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959). The rule is that while a contract will not be judicially enforced where to do so would be to command conduct itself violative of the antitrust laws, see, *e.g., Kaiser Steel Corp. v. Mullins,* —— U.S. ——, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), a contract which is legal on its face and does not require activity in violation of the antitrust laws is not voidable simply because the contract is a result of an antitrust conspiracy, see, *e.g., Kelly,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475; *Viacom International, Inc. v. Tandem,* 526 F.2d 593 (2d Cir. 1975); *Response of Carolina v. Leasco Response, Inc.,* 498 F.2d 314 (5th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672 (S.D.N.Y.1979); *Walker Manufacturing Co. v. M & A Auto Warehouse Distributors, Inc.,* [1979] Trade Cases (CCH) ¶ 62,664 (S.D.N.Y.1979).

■ Here the contracts at issue involve the exchange of money for services and for an agreement that all rights to the resulting product shall rest with the employer. There is nothing illegal on the face of these contracts, and enforcement of the "all

---

**6.** In this regard, it should be noted that Rooney was not ignorant of the producers' position when he signed the contracts in question. Paragraph 7 of Rooney's affidavit submitted on this motion reveals that Rooney knew" ... in

the late 1940's and early 1950's ... that [the producers] asserted that they had the sole and exclusive rights to exhibit all films, new and old, in any and every media without compensating the performers for such exhibition ...."

rights" clauses would not command any conduct violative of the antitrust laws. Accordingly, even if Rooney were able to prove that such clauses resulted from a conspiracy among defendants in restraint of trade, the contracts would be enforceable nonetheless. Having accepted the considerable benefits of such contracts, Rooney cannot now avoid the corresponding obligations by his charge of a separate agreement among defendants in violation of the federal antitrust laws. *Kelly*, 358 U.S. at 520–21, 79 S.Ct. at 431–32; *Viacom International*, 526 F.2d at 599. Rooney's sole remedy for such violation is a timely private cause of action as provided by the federal antitrust laws. *Kelly*, 358 U.S. at 519, 79 S.Ct. at 431; *Response of Carolina*, 498 F.2d at 320.

Accordingly, the Court concludes that the various contracts granted to defendants all rights to use and exploit in the alternative markets pre–1960 films in which Rooney appeared.[7]

As a consequence, defendants are entitled to summary judgment on each of Rooney's four causes of action.[8] As to the first cause of action alleging a conspiracy since at least 1977 to refuse to deal with Rooney concerning his "publicity rights" in pre–1960 films, it is manifest that, as Rooney had no such rights in the pre-1960 films, he cannot have suffered any antitrust injury as the result of any such a conspiracy. See, *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Herrin v. L. M. Collins & Associates, Inc.*, 483 F.Supp. 288 (W.D.Pa.1980). As to the second cause of action alleging wrongful receipt of profits on the exploitation of pre-1960 films, such receipt of profits by defendants is,

under the contracts, not wrongful. As to third cause of action alleging Lanham Act violations for false representations as to defendants' rights to exploit the pre-1960 films, under the contracts it is plain that any such express or implied representations were not false. And as to the fourth cause of action alleging misappropriation of Rooney's common law "right of publicity,"[9] any such rights were assigned or waived by the contracts granting defendants all rights in the pre-1960 films.

Accordingly, defendants' motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

---

7. In view of this conclusion, the Court need not reach defendants' alternative contention that they inherently acquired all rights in the pre-1960 films as an incident of their employer-employee relationship with Rooney. Nor need the Court pass on the question to what extent the releases in SAG 1, SAG 2, SAG 3 and SAG 4 prevent Rooney from challenging defendants' use of pre-1960 films in the alternative markets.

8. Rooney's request for a continuance to take additional discovery under Rule 56(f) is denied.

In view of this Court's ruling as to the plain meaning of the contracts, and Rooney's failure to controvert the record as required by Rule 56(e), none of the discovery Rooney seeks would be relevant to the basis of the Court's decision.

9. The Court expresses no opinion as to the claim that an actor who performs in a role created by another has a "right of publicity" in such performance.