The **PHILADELPHIA ORCHESTRA ASSOCIATION, Plaintiff,**

v.

The **WALT DISNEY COMPANY and Buena Vista Home Video, Defendants.**

**Civ. A. No. 92–2634.**

United States District Court, E.D. Pennsylvania.

April 30, 1993.

Memorandum Denying Reconsideration June 8, 1993.

David H. Pittinsky, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for plaintiff.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, PA, for defendants.

## MEMORANDUM

McGLYNN, District Judge.

## THE PRELUDE

The Philadelphia Orchestra Association ("The Orchestra Association") contends for various reasons that it is entitled to share with Disney[1] in the profits resulting from the sales of the home video release of the Disney classic "Fantasia." Most of the musical score featured in "Fantasia" was performed by The Philadelphia Orchestra[2] in April of 1939 under the baton of the Orchestra's former principle conductor, Leopold Stokowski.[3] In January of that year, The Orchestra Association had contracted with Disney to "furnish and grant" to Disney "the right to use The Philadelphia Orchestra" to record music "for a *feature picture* now in preparation for the Disney Studios," (emphasis added) and also agreed to grant to Disney "the right . . . in connection with this feature, to use the name 'The Philadelphia Orchestra' on the screen and/or in all publicity and exploitation of *said picture.*"[4] (emphasis added) Disney paid the Association $2,500.00 for the rights granted to it in the 1939 Agreement.

In 1940, Disney considered selling phonograph records of the orchestra's 1939 performance under the RCA record label in conjunction with the original theatrical exhibition of "Fantasia." Disney sought and received the permission of The Orchestra Association to sell these phonograph records containing the Orchestra's performance and to use the Orchestra's name in exchange for The Orchestra Association's receiving a share of the record royalties. One agreement provided that Disney, The Orchestra Association, and Stokowski would divide the record royalties equally. In any event, the parties abandoned this project.

The idea was revisited in 1957, however, when Disney decided to sell phonograph recordings of the Orchestra's 1939 performance under its own record label. Disney again sought and received The Orchestra Association's permission to sell phonograph records of the Orchestra's performance and to use the Orchestra's name in exchange for a royalty payment on sales of the records. Since 1957, Disney has regularly paid royalties to

---

1. Herein "Disney" refers to either or both of the defendants Walt Disney Company and Buena Vista Home Video, and/or their predecessors, as the context may require.

2. The Orchestra Association granted Disney the right "to use The Philadelphia Orchestra" rather than the right to employ the members of the Philadelphia Orchestra in the 1939 agreement. Thus, it appears that the performance of the musicians constitutes a performance of the Philadelphia Orchestra even though it was not a regular season engagement and some nonmembers of the Orchestra may have performed for the Disney recording.

3. The evidence suggests that the Orchestra performed all the musical compositions except "The Sorcerer's Apprentice," which was performed by a Hollywood Orchestra before the Philadelphia Orchestra became involved with the project. However, the billing for all uses of "Fantasia" has always credited the Orchestra for the performance without excepting "The Sorcerer's Apprentice."

4. Letter agreement between Disney and the Orchestra Association dated January 11, 1939.

The Orchestra Association in connection with its sales of sound recordings of "Fantasia."

In November of 1991, 51 years after the initial theatrical release of "Fantasia," Disney released "Fantasia" in the new home video formats—videocassettes and laser discs (collectively referred to as "home video"). Disney also released the Orchestra's performance and sound recording of the classical music in "Fantasia" on compact disc as part of the Deluxe Commemorative Edition of "Fantasia." The Orchestra Association receives royalties for the sales of these compact discs which are included in the Deluxe Commemorative Edition box set.

The home video of "Fantasia" includes the Orchestra's 1939 performance, the likeness of the Orchestra (although the likeness used may be of actors hired to portray the Orchestra members), and the Orchestra's name. The name "The Philadelphia Orchestra" is used both in the narration of the film and in the packaging and marketing of the home video. At no time did Disney seek the permission of the Orchestra to use the performance or the name and likeness of the Orchestra in the home video release of "Fantasia," and Disney has never paid any royalties to the Orchestra on the sales of the home video.

The Orchestra Association requested compensation for Disney's use of the performance, the name and the likeness of the Orchestra when the home videos were initially released. Disney refused. Thereafter, The Orchestra Association, unable to find an agreement between The Orchestra Association and Disney, filed an action in May of 1992 for damages against Disney based on various common law claims. After discovery of the 1939 agreement between the Orchestra Association and Disney, the Orchestra Association added contractual claims to their complaint.

Before the court is the Orchestra Association's Motion for Partial Summary Judgment based upon six theories, occasionally overlapping, each of which will be considered in turn.

The criteria for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure. In the comments to the 1963 amendment to this rule, the committee writes that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56, note to subdivision (e). For summary judgment to be granted The Orchestra Association, as the moving party, bears the burden to produce credible evidence that no genuine issue as to any material fact exists and that it is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c). A material fact is one that "would affect the outcome of the suit as determined by the substantive law." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). An issue of fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson* 477 U.S. at 248, 106 S.Ct. at 2510. Every inference must be drawn and doubt resolved in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962).

## THE ORCHESTRA ASSOCIATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### THE FIRST MOVEMENT:

The plaintiff asserts that Disney did not have the right, as a matter of law, under the 1939 agreement or otherwise, to sell copies of the Orchestra's performance or use the Orchestra's name and likeness in a home video release of "Fantasia." (Pl.Mem.Supp. Summ.J. at 34.)

The 1939 agreement between The Orchestra Association and Disney stated in pertinent part:

The Philadelphia Orchestra Association agrees to furnish and grant to Leopold Stokowski and The Disney Studios the right to use The Philadelphia Orchestra for recordings in connection with this *feature*

*picture*[5], said recordings to be made at the Academy of Music.... If additional recording sessions are made necessary by reason of faulty recordings, The Philadelphia Orchestra Association, Inc. agrees to make The Philadelphia Orchestra available for such recordings, on mutually convenient dates; Leopold Stokowski and The Disney Studios to pay all actual costs of said recording session, or sessions.

The Philadelphia Orchestra Association, Inc. further grants the right to Leopold Stokowski and The Disney Studios, in connection with this *feature picture,* to use the name "The Philadelphia Orchestra" on the screen and/or in all publicity and exploitation of *said picture.*[6] (Pl.App.Exh. 2.) (emphasis added)

▆▆▆▆ The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties, as expressed in the language of the contract. *See e.g. Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171 (3d. Cir.1992). Whether a contract is clear and unambiguous is a question of law for the court. *See e.g. Matter of Nelson,* 959 F.2d 1260, 1263 (3d Cir.1992). The court may find ambiguity after hearing "the proffer of the parties" and determining "if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274, 1284 (3d Cir.1991).

▆▆▆ The plaintiff contends that this agreement "unambiguously grants Disney only the limited right to use the Orchestra's name and performance in the theatrical exhibition of 'Fantasia.' " It argues that the phrase "feature picture" clearly means "a feature-length theatrical motion picture intended to be exhibited in theaters outside the home," and that therefore the contract expressly limits the rights granted to Disney to the exhibition of "Fantasia" in theaters outside the home.

The court is not persuaded that the contract can be read so narrowly.

The use of the word "feature" refers to films of a certain length without regard to the medium or location in which they are presented. In *United States v. Twentieth Century–Fox Film Corp.,* 137 F.Supp. 78, 80 (S.D.Cal.1955), the court defined the term "feature films" to mean "sound motion picture photoplays, four or more reels in length other than motion picture photoplays of strictly educational, religious or commercial character, and not including serial motion pictures." Indeed, the phrases "feature film" or "feature picture" have been used interchangeably to describe the programming or program libraries of a television station or cable network. *See e.g.. United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *National Cable Television Assoc., Inc. v. Broadcast Music, Inc.,* 772 F.Supp. 614, 638 (D.D.C.1991). So the common usage of the phrase "feature film" does not necessarily imply a presentation in a theater outside of the home.

Included in the appendix to plaintiff's memorandum in support of its motion for summary judgment, is an agreement dated January 18, 1939 between Stokowski and Disney which sheds some light on this issue. (Pl.App.Exh. 12.) The original agreement, dated December 16, 1937 (Pl.App.Exh. 11), between Disney and Stokowski was to create a short production entitled "The Sorcerer's Apprentice." Later the project was enlarged to a feature length production tentatively entitled "Concert Feature." The January 18, 1939 agreement with Stokowski was signed at the time the project was enlarged. This agreement refers to the "Fantasia" project as a "feature length photoplay" and defines the term "photoplay" or "its equivalent" to "include, but not be limited to a motion picture production, produced and/or exhibited with or accompanied by sound and/or reproducing and/or transmitting devices, are [sic] now or hereafter may be used in connection

---

5. Although this agreement does not state that the "feature picture" in question is "Fantasia," the parties agree that "Fantasia" is the subject of this agreement.

6. Under the employment contracts of the Orchestra members, the musicians could not perform during the 1938–1939 Orchestra season as a group of 25 or more who are under season contract with the Orchestra without the permission of The Orchestra Association.

with the production, exhibition and/or transmission of any present or future kind of motion picture production." Although a similar definition was not included in the agreement with The Orchestra Association, it certainly suggests how Disney, at least, understood the word "feature."

■ There is precedent for placing the burden of clarity upon the party granting rights, here The Orchestra Association. In *Bartsch v. Metro–Goldwyn–Mayer*, 391 F.2d 150 (2d Cir.) *cert. denied* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968), the copyright owners of a musical play assigned to Bartsch, in 1930, the right to copyright, vend, license and exhibit the "motion picture photoplay" of the musical throughout the world. Judge Friendly held that this included the right to televise the motion picture version of the play. Of particular interest is the court's statement that

> [i]f the words are broad enough to cover the new use, it seems fairer that the burden of framing and negotiating an exception should fall on the grantor; if Bartsch or his assignors had desired to limit "exhibition" of the motion picture to the conventional method where light is carried from a projector to a screen directly beheld by the viewer, they could have said so. *Id.* at 155.

In the case at bar, the use of the term "feature picture" in the agreement between The Orchestra Association and Disney, clearly excludes phonograph records or like audio recordings; it does not clearly exclude any media in which the complete film may be presented.

### THE SECOND MOVEMENT:

■ The plaintiff contends that the rights granted to Disney in the 1939 Agreement did not include the rights to use the Orchestra's performance or name in home video formats since the technology involved "did not exist and [was] not even in contemplation at the time of the 1939 Agreement." (Pl.Mem. Supp.Summ.J. at 37.)

■ The plaintiff has asked the court to take judicial notice of the fact that ". . . as of 1939, no one could have contemplated that there would come a time when feature-length theatrical motion pictures exhibited in the-aters outside the home could be sold in videocassette and laser disc formats for home television viewing[.]" (Pl.Mem.Supp. Summ.J. at 38.) "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). While it may be true that, as the plaintiff contends, the videotape recorder, the forerunner to the videocassette recorder ("VCR"), was not introduced until 1956 and was not commercially marketed until the late 1960's, and that the VCR was not introduced until the mid–1970's and the laser disc player thereafter, the court can not take judicial notice that the home video medium could not have been *contemplated* by some inventive minds in 1939 even though it was not yet in production.

Moreover, as defendant points out, a market for home viewing of movies existed prior to the 1930's. (Def.Mem.Opp'n Summ.J. at 31–32.) It appears that, at this time, motion pictures were offered for sale or rental in a variety of formats, including 28mm film and film discs. Also, there is evidence that a precursor to today's home video technology was under development. As early as 1927, an inventor demonstrated his "Phonovisor" at a London department store using phonograph equipment to record a television signal on a wax disc for playback on a mechanical television device. With this evidence before it, a jury may easily conclude that home video technology was contemplated at the time of the agreement.

In 1956, the Third Circuit considered whether a man should be deemed to have granted a use, not in existence and not contemplated by either party, at the time the contract was made. *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481, 488 *cert. denied* 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956). The court referred to one example of the man who sells a farm that five years later becomes valuable real estate due to urban expansion. Since the farm was sold outright, the seller would not be entitled to any additional compensation for the new use.

By way of contrast, the court cited *Manners v. Morosco,* 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590 (1920), where the author of a play granted a producer "sole and exclusive license and liberty to produce, perform and represent" the play in United States and Canada, as an example of where a new use (television) would not be deemed to have been granted in the original contract. The court commented that "it should be borne in mind that the context of the contract made it reasonably clear that stage productions only were contemplated by the parties to the contract." *Id.* However, such a limitation cannot be gleaned from the language of the contract between Disney and The Orchestra Association.

In an attempt to demonstrate that the rights granted to Disney by the Orchestra were limited in the language of the agreement to the theatrical exhibition of the film, the plaintiff compared the 1939 Agreement between the Orchestra and Disney to the agreement of the same year between Stokowski and Disney which has been discussed earlier. In the agreement with Stokowski, Disney attained rights which expressly included both the rights to the "photoplay" and all "improvements and devices which are now or hereafter may be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture productions." While it is true that this contract clearly provides that future uses of the film may be made by Disney without compensation to Stokowski, for obvious reasons, it does not resolve the ambiguity that exists in the agreement between Disney and The Orchestra Association.

**THE THIRD MOVEMENT:**

 The next argument advanced by The Orchestra Association is that it and Disney are "joint authors" of "Fantasia." (Pl. Mem.Supp.Summ.J. at 41.) "Joint authors" automatically acquire an undivided ownership in the entire work, including all the

contributions contained therein. *See e.g. Pye v. Mitchell,* 574 F.2d 476, 480 (9th Cir.1978). The essence of joint authorship is a joint laboring in furtherance of a preconceived common design. *See, e.g. Edward B. Marks Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266, 267 (2d Cir.1944). The authors need not be temporally or physically proximate to create a joint work as long as each intended at the time he made his contribution that it would either augment, or be augmented by, a later or earlier contribution to form a unitary whole. *Id.* at 267. The plaintiff points out that the contract between Disney and The Orchestra Association specifically provided that the Orchestra's performance was to be "in connection with this feature picture." (Pl.Mem.Supp.Summ.J. at 45.) And the contract between Disney and Stokowski recognized that the Orchestra's performance would be used in conjunction with Disney animation. There cannot be any dispute that the performance was rendered with the intention that the music be combined with the animation in "Fantasia." Indeed, the Orchestra receives equal billing with Disney in "Fantasia" and the promotional material authored by Disney itself states:

> Artistically, "Fantasia" represents one of the greatest collaborations in motion picture history. Leopold Stokowski and the Philadelphia Orchestra joined forces with Walt Disney and his team of top talents to create a form of motion picture entertainment that was unlike any that preceded it ... Their goal was to create music you could see and pictures you could hear. (Pl.App.Exh. 29.)

Unquestionably Disney valued the contribution of the Orchestra to the film. However, a magnificent performance does not a joint author make. When the evidence is viewed in its entirety, it is clear that the Orchestra was not a joint author of "Fantasia." The Orchestra's performance was clearly a "work made for hire" under the 1909 Copyright Act.[7] The 1909 Act defined the word "au-

---

7. The Copyright Law of 1909 as amended applies to the instant case because "Fantasia" was recorded prior to the effective date of the Copyright Act of 1976. *Roth v. Pritikin,* 710 F.2d 934, 937–40 (2d Cir.) *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983). The Copyright Law of 1909 and the cases decided thereunder will control the definitions of "Work Made for Hire" and "Joint Authorship" since these doctrines determine who holds the Copyright. [A] retroactive application will not be given a statute "... unless such be 'the unequivocal and inflexi-

thor" to include an employer in the case of works made for hire, 17 U.S.C. § 26 (repealed 1976), but did not further define work made for hire. Case law passing the Act expanded the relationships that qualified under the employer-employee rubric; the test of actual control by the commissioning party slackened in the sixties to become a mere right to control (even if not exercised) standard. Latman *Copyright for the Nineties* at 309 (1989). Ultimately, a firm presumption developed under which one who commissioned another to create a copyrightable work was considered to be the "author" within the work made for hire doctrine. *Id., See Easter Seal Society for Crippled Children and Adults v. Playboy Enterprises,* 815 F.2d 323, 327 (5th Cir.1987) *cert. denied* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).

In order to determine if a work was made for hire under the 1909 law, courts have considered several factors. Among these are (1) whether the work was produced at the "instance and expense" of the commissioning party[8]; (2) which party was the motivating factor in the creation of the work[9] and (3) whether the "commissioning party" had the right to control and supervise the work's use and creation, even if this right was not exercised.[10] In addition to looking at the contractual language to determine the original intent of the parties concerning copyright ownership, court have looked to the conduct of the parties and parol evidence.[11]

In *Picture Music v. Bourne Inc.,* 457 F.2d 1213 (2d Cir.) *cert. denied* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972),[12] the court held that where a motion picture producer had control over the original song, engaged

the creator to adapt the song, remained free to accept, reject, or modify the work, and the creator accepted payment for the work, the work was considered for hire.

Here, as related in plaintiff's "statement of undisputed facts" Disney paid The Orchestra Association $2,500.00 for the use of the Orchestra for the recordings for "Fantasia," The Orchestra Association was not free to select the pieces it performed, Disney used its own instruments and personnel to make the recordings of the Orchestra's performance (Walt Disney himself attended the recording) and Disney employees were present during the Orchestra's practice sessions prior to recording. (Pl.Mem., p. 16–18.) Moreover, Disney paid all expenses of the rehearsals and recording including the wages of the musicians, stage hands, a music librarian and The Orchestra Association personnel manager, totaling $17,975.50. There can be no doubt that the recordings were done at the "instance and expense" of Disney.

The December 16, 1937 contract between Stokowski and Disney reveals that Disney initially entered into an agreement with Stokowski to conduct an orchestra for recordings in connection with "Fantasia." (Pl.App. Exh. 11.) An orchestra had not been selected at this time, nor had the music. One of Stokowski's responsibilities was to "select and employ a complete symphony orchestra." Disney had the responsibility to furnish the recording devices, and to pay any necessary royalties or licensing fees that may be needed to record certain music. Stokowski agreed to "consult with [Disney] concerning the music for ['Fantasia']." When the project was expanded from a short photoplay to

---

ble import of the terms, and the manifest intention of the legislature.' " *Union Pacific R.R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). The Copyright Act of 1976 does not purport to govern who holds the Copyright for works created before January 1, 1978. It merely clarifies the rights of individuals owning copyrights on that date, whomever they may be.

**8.** *Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 567 (2d Cir.1966).

**9.** *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213 (2d Cir.) *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972).

**10.** *See Rand McNally & Co. v. Fleet Management Systems Inc.,* 591 F.Supp. 726, 738 (N.D.Ill. 1983); *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.,* 375 F.2d 639, 643 (2d Cir. 1967), *cert. denied,* 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968) (citing Nimmer, Copyright § 62.31 (1964)).

**11.** *Real Estate Data v. Sidwell Co.,* 809 F.2d 366 (7th Cir.1987).

**12.** It is important to note that the performer in the *Bourne* case, also employed by Disney, had a more expansive role in the creative process.

a feature length photoplay, Disney and Stokowski rescinded their previous agreement and entered into a new agreement dated January 18, 1939. (Pl.App.Exh. 12.) In this later agreement, Stokowski assumed the responsibility to "use his best efforts" to "obligate the Philadelphia Symphony (sic) Orchestra to do said recording" and to furnish Disney "with a written commitment executed by the properly constituted and empowered authority, granting [Disney] the right to use the said Philadelphia Symphony [sic] Orchestra, its name and the music rendered by it hereunder for the purposes herein provided and contemplated in this contract." The terms of the contract obligated Stokowski to "prepare and rehearse the said orchestra" and required that "... all music and recordings must be reasonably suitable and in conformity with [Disney's] animation requirements, and that the same shall be subject to our approval[.]" All of these factors clearly demonstrate that Disney was the motivating factor and that Disney maintained control of the Orchestra through Stokowski.

Further undermining plaintiff's joint authorship argument is the broadly worded document signed by the musicians granting all rights in their performance to Disney which included the following statement:

> We, the undersigned, musicians of the Philadelphia Philharmonic Symphony Orchestra, hereby represent that we have been *employed* by Walt Disney Productions, a California Corporation, through special arrangements made with Leopold Stokowski, to render our services in the recording of music for use by said Walt Disney Productions, in and in connection with an animated motion picture now in production. (Pl.App.Exh. 15.) (emphasis added)

It should also be noted that the Orchestra did not take part in the editing of the soundtrack. Their contribution was limited to performing the music under the direction of Stokowski for four days in April of 1939. The Orchestra Association did not take part in any production decisions thereafter. (Pl. Mem.Supp.Summ.J. at 16–19; Def. Mem.Opp'n Summ.J. at 39–40.)

Clearly the record does not support joint authorship but a contrary conclusion.

## THE FOURTH MOVEMENT:

The plaintiff also asserts that Disney breached its 1939 agreement with the Orchestra Association by releasing "Fantasia" on videocassette and laser disc formats without the consent of the Orchestra Association and without paying the Orchestra Association additional compensation. (Pl.Mem.Supp. Summ.J. at 49.) This contention overlaps somewhat the plaintiff's first contention (that Disney had no contractual right to use the Orchestra's performance, name and likeness in the home video of "Fantasia") since if an issue remains as to whether Disney had such a contractual right to use the name and likeness of the Orchestra in "Fantasia," Disney cannot be faulted for doing so. Therefore, the court will not grant plaintiff's motion based upon the fourth contention for the same reason that summary judgment was denied based upon the plaintiff's first contention.

## THE FIFTH MOVEMENT:

The plaintiff contends that the Orchestra Association's right of publicity has been violated by Disney's use of the Orchestra's name and likeness in the home video release of "Fantasia." (Pl.Mem.Supp. Summ.J. at 52.) This contention may be distinguished from those preceding it in that it concerns only the name and likeness of the Philadelphia Orchestra, not the performance of the musicians who, it will be recalled, signed the broadly worded release of rights to their work. Individuals and groups hold the right to control the commercial exploitation of their inherently distinctive names and likenesses, which right is referred to as their "right of publicity." *See e.g. Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). A defendant violates a plaintiff's right of publicity by appropriating its valuable name or likeness, without authorization, to defendant's commercial advantage. *See e.g. Id.* The name appropriated must have secondary meaning, which has been described by the Third Circuit, in *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 858 (1992), as follows:

When a particular business has used words *public juris* for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained secondary meaning.

The plaintiff established that the name "The Philadelphia Orchestra" has attained such a secondary meaning. The name is synonymous with the Orchestra. The Orchestra Association has used the name "The Philadelphia Orchestra" for over 90 years and the Orchestra enjoys an outstanding reputation. The Orchestra Association holds a right of publicity in the inherently distinctive name, "The Philadelphia Orchestra." The name and likeness of the Orchestra is indeed used in "Fantasia," and in the packaging and marketing of the video. However, summary judgment can not be granted in favor of the plaintiff since a factual issue remains as to whether the 1939 agreement between Disney and the Orchestra Association embraces the home video release of "Fantasia." Again, the meaning of the term "feature film" in the 1939 agreement needs to be determined. There may be some question as to whether Disney was ever granted the right to use the likeness of the Orchestra by The Orchestra Association since the 1939 agreement did not mention the likeness of the Orchestra.

## THE SIXTH MOVEMENT:

▇ Finally, the plaintiff argues that Disney has wilfully violated the Lanham Act by misleading the public into believing that the Orchestra Association has sponsored, licensed or consented to the manufacture, marketing and selling of the videocassette and laser disc formats of "Fantasia." (Pl. Mem.Supp.Summ.J. at 58.) Section 43(a) of the Lanham Act provides, in pertinent part, that:

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act. 15 U.S.C. § 1125(a).

The plaintiff asserts that "[t]o establish liability and obtain an accounting under § 43(a), the Orchestra Association need only prove that it possesses a valid and protected property interest in its trade name and that Disney had used its trade name in a manner which is likely to confuse the public into believing that the videocassette and laser disc formats of 'Fantasia' are somehow associated with the Orchestra Association or that the Orchestra Association has sponsored, licensed or consented to the manufacture, sale or marketing of the videocassette and laser disc formats of 'Fantasia.'" (Pl.Mem.Supp. Summ.J. at 59.) (internal citations omitted). While it is undeniable that the Orchestra Association possesses a valid and protected property interest in its trade name, it is not clear that Disney has used the name "The Philadelphia Orchestra" in a confusing manner which would violate the Act. It may be enough to establish an "association, affiliation, or connection" between the Orchestra and "Fantasia" that the Philadelphia Orchestra performed the music. The "origin" of the music in "Fantasia" is represented as being with the Orchestra and this is true. It is not apparent that the use of the name was misleading to the public.

The plaintiff suggests that although the Orchestra did perform the work, Disney's use of the Orchestra's name is misleading because it creates a "likelihood of confusion" in that the use of the name suggests to the public that the Orchestra Association has granted its permission to use the name on the home video, which plaintiff seems to analogize to a false endorsement. (Pl.Mem.Supp. Summ.J. at 65–74.) However, it is not clear that such an analogy is sound. The plaintiff has not established that Disney represented

that the Orchestra endorsed the home video. Rather, it appears that Disney has repre-sented only that the Orchestra's performance is contained in the home video. The plaintiff cited no authority for the proposition that Disney would violate the Lanham Act by truthfully billing the Orchestra on the home video. Also, the issue remains as to whether Disney's use of the Orchestra's name was authorized by the 1939 agreement. Thus, the plaintiff's motion for partial summary judgment can not be granted.

**THE CODA**

The court concludes that the meaning of the term "feature film" as used in the contract between Disney and The Orchestra Association is ambiguous and that the ambiguity must be resolved before the issues raised by the plaintiff concerning the scope of the contract rights granted to Disney by The Orchestra Association can be decided. The court also concludes that the performance rendered in 1939 by the Philadelphia Orchestra for Disney was a work made for hire and that The Orchestra Association is not a joint author of "Fantasia." Finally, the plaintiff failed to prove that Disney violated the Lanham Act by releasing home videos which correctly credited the Philadelphia Orchestra for the performance of the music in "Fantasia." For the foregoing reasons, plaintiff's motion for Partial Summary Judgment will be denied.

## MEMORANDUM ON RECONSIDERATION

This motion for reconsideration and reargument of the court's ruling on plaintiff's motion for partial summary judgment challenges only the court's determination that plaintiff has failed to establish a viable claim under the joint-authorship doctrine. Plaintiff asserts that the court erred "by (1) failing to recognize that the work-for-hire doctrine creates only a *rebuttable presumption* and (2) prohibiting the jury from deciding at trial whether that presumption was capable of being rebutted by plaintiff." (Plaintiff's motion for Reconsideration and Reargument at 5) (emphasis in the original).

It would appear that the plaintiff is in error. First of all, the court noted in its memorandum accompanying the order that "a firm presumption developed under which one who commissioned another to create a copyrightable work was considered to be the 'author' within the work made for hire doctrine." (Memorandum of the Court dated April 30, 1993) (citation omitted).

Secondly, the facts relied upon by the court in making its determination were undisputed and unrebutted. Clearly, the evidence proffered by the plaintiff in its motion for summary judgment does not make out a claim of joint-authorship. Indeed, if the matter were to proceed to trial on the evidence presented in the motion for partial summary judgment, defendants would be entitled to a dismissal at the close of the plaintiff's case. There is simply no evidence to rebut the presumption and, significantly, plaintiff does not now contend that there is new evidence not previously available.

The motion for Reconsideration and Reargument will be denied.

AND NOW, this 8th day of June, 1993, it is hereby ORDERED that The Philadelphia Orchestra Association's motion for Reargument and Reconsideration is **DENIED.**