Herman E. MULLER, Jr., as the Executor under the Last Will and Testament of Leopold Stokowski, Plaintiff,

v.

The WALT DISNEY PRODUCTIONS, The Walt Disney Company, and Buena Vista Home Video, Defendants.

The WALT DISNEY COMPANY and Buena Vista Home Video, Plaintiffs,

v.

Herman E. MULLER, in his capacity as Executor for the Estate of Leopold Stokowski, deceased, Defendant.

Nos. 93 Civ. 0427 (GLG), 93 Civ. 6175 (GLG).

United States District Court, S.D. New York.

Dec. 22, 1994.

Bartlett, Pontiff, Stewart & Rhodes, P.C. (Richard J. Bartlett, Mark E. Cerasano, Gary C. Hobbs, of counsel), Glens Falls, NY,

Schlam, Stone & Dolan (Richard H. Dolan, of counsel), New York City for Muller.

Sanford M. Litvack, Edward J. Nowak, Dewey Ballantine (Eric J. Lobenfeld, Elizabeth M. Guggenheimer, of counsel), New York City for Disney.

## OPINION

GOETTEL, District Judge:

The movie "Fantasia" was not a financial success upon its initial release in 1940. However, "Fantasia's" fall 1991 release on videocassette and laser disc ("home video") has been profitable, purportedly to the tune of $190 million. The cases before us arose from a 1939 contract between Leopold Stokowski, then the conductor of the Philadelphia Orchestra, and Walt Disney Productions, entered into for the purpose of making "Fantasia." Muller, the Executor under the Last Will and Testament of Leopold Stokowski, is suing Walt Disney Productions, The Walt Disney Company, and Buena Vista Home Video for a share of the profits from home video sales of "Fantasia." Disney now moves for summary judgment (the term "Disney" will be used to refer to the Disney corporate entities involved in this suit).

## PROCEDURAL HISTORY

The home video release of "Fantasia" has spawned several lawsuits. In May 1992, the Philadelphia Orchestra Association filed suit against Disney in the Eastern District of Pennsylvania, seeking a share of the profits from the home video release of "Fantasia." *See Philadelphia Orchestra Ass'n v. Walt Disney Co.*, 821 F.Supp. 341 (E.D.Pa.1993) (McGlynn, J.) (partially granting and partially denying defendant's summary judgment motion). On December 30, 1992 Disney filed suit against Muller, also in the Eastern District of Pennsylvania, seeking a declaration that Stokowski's estate had no rights in connection with the sale and distribution of "Fantasia," and that Stokowski's estate must indemnify Disney for any sums adjudged against Disney in the Philadelphia Orchestra Association's lawsuit.

Shortly thereafter, in January 1993, Muller sued Disney in the Southern District of New

York. The apparent reason Muller sued in this district is that Stokowski's will was probated in the Westchester County Surrogate's Court. (While he died in England in 1977, Stokowski lived out his life as a domiciliary of Scarsdale, New York.) On May 26, 1993, we denied Disney's motion to transfer *Muller v. Disney* to Pennsylvania, or stay the action pending resolution of the earlier lawsuit. *See Muller v. Walt Disney Prods.,* 822 F.Supp. 1033 (S.D.N.Y.1993). Judge McGlynn then granted Muller's motion to transfer *Disney v. Muller* to this district. *See Walt Disney Co. v. Muller,* No. 92 Civ. 7440, 1993 WL 273416 (E.D.Pa. July 20, 1993). Earlier this year, we granted Muller's motion to dismiss Disney's claims for indemnification and setoff against the Philadelphia Orchestra Association's claims. *See Muller v. Walt Disney Prods.,* No. 93 Civ. 427 (S.D.N.Y. January 17, 1994).

In the other related lawsuit, Boosey & Hawkes, the publishers of Igor Stravinsky's "The Rite of Spring," which was featured in "Fantasia," are also seeking a share of Disney's profits from home video sales. *See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.,* No. 93 Civ. 0383, 1993 WL 454247 (S.D.N.Y. October 29, 1993) (denying Disney's motion to transfer the case to the Eastern District of Pennsylvania).

## FACTS

The instant motion turns on the 1939 contract between Stokowski and Disney. The 1939 contract replaced a 1937 contract between Stokowski and Disney whereby Stokowski performed certain musical services for "The Sorceror's Apprentice," an animated short which was subsequently made a part of "Fantasia."

The 1939 contract, which Vice–President Roy O. Disney signed for Disney, contemplated a feature-length animated movie featuring classical music. Paragraphs three and four of the 1939 contract provide an overview of the entire contract:

3. We [Disney] hereby employ and engage you [Stokowski] to render and perform your services for us as hereinafter provided, in connection with the preparation for the production of our photoplay now tentatively entitled the "Concert Feature." [later renamed "Fantasia"]. . . .

4. Your services hereunder shall be rendered and performed for us in preparing music to be used in said photoplay, in full accordance with the necessities and requirements of the motion picture medium in which the same is intended to be produced, as well as in the writing and/or preparation of orchestrations and arrangements of music and musical compositions selected by you and us; as a conductor and otherwise in the making and furnishing of a recording and/or recordings suitable to our medium of motion picture production to be used in said photoplay; supervising, rehearsing and directing the orchestra or orchestras for said recording; and in an advisory and/or consulting capacity with reference to any or all musical matters pertaining to said photoplay or as hereafter more specifically provided.

Subsequent paragraphs set forth the recording schedule, Stokowski's responsibilities to engage the Philadelphia Symphony, and details concerning the recording equipment. Paragraph nine provides for Stokowski to receive $125,000 for his work under the contract.[1]

Paragraphs ten through twelve are at the center of the parties' dispute. In these paragraphs, the parties' rights to "Fantasia" and its music are delineated:

10. It is specifically understood and agreed that we [Disney] shall have sole charge and control of the manner in which, and the terms upon which, said photoplay shall be distributed, explaited [sic] and/or exhibited, *and the ownership of all rights in connection with said photoplay shall belong to us* and we shall have the right, should we deem it advisable, to distribute said photoplay, or any part thereof, or withold [sic] the same, or any part thereof, from distribution, it being expressly understood that all matters pertaining to the foregoing and to the manner in which, and the terms under which, any of our negatives or prints of said photoplay may be

---

1. The present value of $125,000 in 1939 is approximately $1.3 million in today's dollars.

sold or otherwise disposed of shall be within our sole judgment and control and that you shall have no voice or control whatsoever in the same.

11. We shall have the right to reproduce, record, transmit, exhibit, distribute and exploit, in connection with said photoplay, any or all work, acts, poses, plays and appearances of any and all kinds hereunder and any and all musical, dramatic or other material, including, but not limiting the same to orchestration and/or arrangements of music, written or prepared by you hereunder, and we shall further have the right to record, reproduce, transmit, exhibit, distribute and exploit in connection with said photoplay all instrumental, musical and other sound effects produced by you or with your assistance or under your direction or supervision in connection with the performance by you of your required services hereunder; *it being understood that, excepting only as hereinafter expressly provided, we shall own all rights of every kind in and to the foregoing.* ....

12. The ownership of the music in connection with said photoplay shall be as follows:

.     .     .     .     .

(b) Arrangements or orchestrations made by you of music in the public domain shall belong to you *with the license to us to use the same for and in the photoplay contemplated herein and in connection with the advertising and exploitation thereof* together with the exclusive license to us to use said arrangements or orchestrations for motion pictures and television purposes during the period of ten years from the date hereof, and a non-exclusive license to us for motion picture and television purposes during the full life of all copyrights therein and all extensions of the same.

(c) [Same arrangement as in preceding paragraph for] Arrangements and orchestrations made by you of music not in the public domain....

.     .     .     .     .

(e) Neither you nor we shall use or grant the right to use the music or musical rights referred to in (a), (b), or (c) above to third parties in connection with or in any other photoplay, without mutual consent, except as herein otherwise specifically provided.

(emphasis added).

As these excerpts make clear, Disney's contractual rights to the "photoplay" that became "Fantasia" are extremely broad. Paragraph three defines the term "photoplay" as follows:

The term "photoplay" or its equivalent as used herein, shall be deemed to include, but not be limited to a motion picture production, produced and/or exhibited with or accompanied by sound and/or reproducing and/or transmitting devices, radio devices, television and all other improvements and devices which are now or hereafter may be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture production.

The contract also deals with the parties' rights with regard to phonograph records:

13. Neither you nor we shall have the right to use the said recordings or to contract for the use thereof with third parties in, on or in connection with phonograph records unless specifically agreed to by both parties hereto in writing.

In 1956, pursuant to this provision, Stokowski and Disney entered into an agreement granting Disney the right to use "Fantasia" music in connection with the commercial sale of phonograph records, for which Disney agreed to pay Stokowski royalties.

## ANALYSIS

To prevail on its motion for summary judgment, Disney must demonstrate "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, we must resolve all ambiguities and draw all inferences in favor of Muller, the non-moving party. *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). Summary judgment is only warranted when no reasonable trier of fact could find for the

non-moving party. *Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

■ If the language of a contract is clear and unambiguous, a court may rule on the contract's meaning as a matter of law. *Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979); *Groff v. Continental Ins. Co.,* 741 F.Supp. 541, 549 (E.D.Pa.1990).

In our earlier memorandum decision, we determined that the law of either California or Pennsylvania should govern this case. *See Muller v. Walt Disney Prods.,* No. 93 Civ. 427, slip op. at 5–6 (S.D.N.Y. January 17, 1994). Muller now argues that California's law should govern. There is no need to further refine this issue, however, since the law of California and Pennsylvania is the same for the legal issues pertaining to the instant motion.

*1. Discovery of Drafts of the 1939 Contract*

■ As a preliminary matter, we must deal with Muller's argument that Disney must produce three drafts of the 1939 agreement. Disney has refused to produce the drafts, citing attorney-client privilege. In an earlier memorandum decision, we found that preliminary drafts of contracts are generally protected by attorney-client privilege, since " '[p]reliminary drafts may reflect not only client confidences, but also the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege.' " *Muller v. Walt Disney Prods.,* 93 Civ. 427, slip op. at 3 (S.D.N.Y. September 26, 1994) (quoting *Schenet v. Anderson,* 678 F.Supp. 1280, 1284 (E.D.Mich.1988)). However, we found that Disney had not sufficiently substantiated its claim of attorney-client privilege. Subsequently, Disney submitted a letter from Edward J. Nowak, Vice President and Assistant General Counsel at Disney, stating that the drafts at issue "do contain client confidences and legal advice and opinions of Disney's counsel, and there is no indication anywhere that these documents were disclosed to third parties." According-

ly, we find that the drafts are protected by the attorney-client privilege.

*2. The Parties' Contractual Rights*

■ The ordinary meaning of the 1939 contract, read as a whole, is straightforward. Paragraph ten declares that Disney has complete control over the distribution, exploitation and exhibition of the photoplay, and that Disney owns all rights in connection with the photoplay. Paragraph eleven gives Disney "all rights of every kind in and to" Stokowski's work in connection with the photoplay, "excepting only as hereinafter expressly provided." The exceptions are found in paragraph twelve, which gives Stokowski ownership of his arrangements and orchestrations, with a license to Disney to use them in the photoplay.

In short, the contract clearly gives Disney all the rights to the photoplay, and gives Stokowski no rights to the photoplay. Thus, as long as home video falls within the contract's definition of the photoplay, then Stokowski's estate does not retain any contractual rights in the home video versions of "Fantasia."

The 1939 contract's definition of "photoplay," found in paragraph three, is expansive. In addition to including all aspects of motion pictures as they were produced and exhibited with the then existing technology, it includes "all other improvements and devices which are now or hereafter may be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture production."

This definition of "photoplay" clearly is intended to embrace new technologies for the "production, exhibition and/or transmission" of motion pictures. There is no point in quibbling about whether home video involves production, exhibition, or transmission. The contractual language is clearly designed to embrace future means by which motion pictures can reach consumers, in public or in private. We find that home video is encompassed within the contract's definition of "photoplay," and therefore that Disney did not violate the 1939 contract in releasing "Fantasia" on home video without securing

any additional rights from Stokowski's estate.

The district court in *Rooney v. Columbia Pictures Indus., Inc.,* 538 F.Supp. 211 (S.D.N.Y.), *aff'd,* 714 F.2d 117 (2d Cir.1982) (table), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) reached a like conclusion in a case presenting a nearly identical legal issue. Plaintiff Mickey Rooney sued a number of producers and distributors of motion picture films, claiming that his pre–1960 contracts granting them the right to exhibit films containing his performances in movie theaters did not grant them the right to exhibit such films in "alternative markets," including home video. Four of the contracts in *Rooney* contained language nearly identical, or in fact identical, to the definition of "photoplay" in the 1939 contract between Stokowski and Disney. *See id.* at 213, 217–19.

Rooney argued that while he might have granted the defendants the right to exhibit his movies on television, this grant did not cover the sale of his films on home video. The *Rooney* court rejected Rooney's argument, in language directly applicable to the instant case:

> The contracts in question gave defendants extremely broad rights in the distribution and exhibition of pre–1960 films, plainly intending that such rights would be without limitation unless otherwise specified and further indicating that future technological advances in methods of reproduction, transmission and exhibition would inure to the benefit of defendants. The contracts generally do not limit defendants' rights to "exhibition" of the films, but also convey the rights of "recording," "reproducing," "transmitting," and "exploiting." Thus there is little basis for Rooney's proposed distinction between immediate exhibition of the film by television and the sale of videocassettes for home exhibition. In any event, given the uniformly expansive nature of defendants' rights in the contracts, no reason appears why the word "exhibit" should be given such a restricted construction. As defendants point out, whether the exhibition apparatus is a home videocassette player or a television sta-

tion's broadcast transmitter, the films are "exhibited" as images on home television screens.

*Id.* at 228.

Muller argues that *Rooney* is not on point because Rooney did not retain any ownership rights in his films, whereas Stokowski did retain rights to his arrangements and orchestrations. This is a distinction without a difference, since the instant lawsuit is about home video, rather than arrangements and orchestrations. Disney, just like the companies that Rooney contracted with, had very broad rights in the distribution and exhibition of the "photoplay." The contract between Stokowski and Disney is very similar to Rooney's contracts, and Muller's claims are in essence the same as Rooney's claims. Muller cannot escape the fact that *Rooney* is directly on point.

Another similar case supports our conclusion as to the 1939 contract between Stokowski and Disney. In *Platinum Record Co. v. Lucasfilm, Ltd.,* 566 F.Supp. 226 (D.N.J. 1983) the plaintiff argued that its grant to Lucasfilm of the right to use certain songs in the motion picture "American Graffiti" did not grant Lucasfilm the right to use the songs when it distributed the movie on home video. *Id.* at 227. The parties' contract granted Lucasfilm the right to "exhibit, distribute, exploit, market and perform said motion picture ... by any means or methods now or hereafter known." *Id.* In finding for the defendant, the court specifically rejected the argument that the showing of movies on home video was not an "exhibition" of a motion picture under the terms of the contract. *Id.* at 227–28.

Muller's attempts to avoid the natural meaning of the 1939 contracts are unpersuasive. Moreover, the cases Muller cites in which grants of rights for television or motion picture exhibition in theater were found not to encompass home video are not on point, since the contracts in those cases did not address future technology. *See Rey v. Lafferty,* 990 F.2d 1379 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993); *Cohen v. Paramount Pictures Corp.,* 845 F.2d 851 (9th Cir.1988). Indeed, the *Rey* and *Cohen* courts distin-

guished *Rooney* and *Platinum,* cited above, on this very ground. *See Rey,* 990 F.2d at 1390; *Cohen,* 845 F.2d at 855.

In short, it is clear that Disney did not violate the 1939 contract with Stokowski when it released "Fantasia" on home video without securing any additional rights from Stokowski's estate.

### 3. Joint Authorship

█ Muller contends that Stokowski and Disney were joint authors in the creation of "Fantasia," and that Stokowski's estate thus has an undivided one-half ownership share in "Fantasia." Disney counters that Stokowski performed work for hire, which makes Disney the sole owner of the copyright in "Fantasia."

█ In determining whether two or more persons should be considered joint authors, courts focus on whether the persons regarded themselves as joint authors. *See Childress v. Taylor,* 945 F.2d 500, 508 (2d Cir.1991). When work is performed for hire, there is a statutory presumption that the employer is the sole owner of the copyright in the work.[2] *See Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 567 (2d Cir.1966); *see also Murray v. Gelderman,* 566 F.2d 1307, 1309 (5th Cir.1978). This presumption can only be overcome by an express contractual provision to the contrary. *See Brattleboro,* 369 F.2d at 567.

█ According to the caselaw, an employer is the author "whenever an employee's work is produced at the instance and expense of his employer." *Id.* Put another way, the employer is the author when the employer is the "motivating factor" in the creation and production of the work. *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). Courts have also looked at whether the employer had the right to direct and supervise the creation and use of the work. *Id.* at 1216; *see also Murray,* 566 F.2d at 1310. These principles apply not only to employees but also to independent contractors. *Brattleboro,* 369 F.2d at 568.

The 1939 contract strongly support's Disney's claims, in that it clearly contemplates work for hire, and explicitly reserves all rights in "Fantasia" to Disney. Pursuant to paragraph nine, Disney paid Stokowski $125,000 for his work, which was to be "compensation in full" for Stokowski's services, and for the rights he granted Disney to use his musical work. As discussed in the preceding section, paragraph ten declares that Disney owns all rights in connection with the photoplay, and paragraph eleven gives Disney "all rights of every kind in and to" Stokowski's work in connection with the photoplay. Additionally, paragraph seven grants Disney the right to reject or approve Stokowski's musical work:

> It is agreed, owing to the peculiar technical requirements of the medium in which the said animated photoplay is to be produced, that all music and recordings must be reasonably suitable and in conformity with our animation requirements, and that the same shall be subject to our approval....

The 1939 contract is unambiguous evidence that Disney and Stokowski were not joint authors of "Fantasia."

Muller has attempted to present evidence from which a reasonable person could infer that Disney and Stokowski saw themselves as joint authors, and that Stokowski did not perform work for hire. Muller argues that Stokowski actively collaborated with Disney in selecting the musical works to be performed in the movie, and in visualizing the animation to accompany the music. Muller points out that paragraph seven of the 1939 contract gives Stokowski some control over the music in "Fantasia":

> [F]rom the standpoint of the artistic merit of the music, aside from the technical animation requirements of recording, and its suitability for the medium of our animated photoplay, you shall have the full right to record again, in whole or in part, that which fails to meet with your approval,

**2.** The statute in question is the 1909 Copyright Act because "Fantasia" was created before the effective date of the Copyright Act of 1976. *See Roth v. Pritikin,* 710 F.2d 934, 937–40 (2d Cir.),

*cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983); *Philadelphia Orchestra Ass'n v. Walt Disney Co.,* 821 F.Supp. 341, 347 n. 7 (E.D.Pa.1993).

provided, however, that the same shall be done within the period of the recording time as set forth in Schedule "A" attached hereto.

Muller also points to journalistic accounts of the making of "Fantasia" which portray Stokowski as a collaborator with Walt Disney.

However, this evidence pales in significance next to the fact that for the thirty-seven years between the initial release of "Fantasia" and Stokowski's death in 1977, Stokowski himself never asserted any ownership rights. He never claimed to be an author despite Disney's repeated theatrical and television releases of "Fantasia," and the 1940 registration and 1968 renewal of the "Fantasia" copyright in Disney's name.

Given the straightforward language of the 1939 contract, under which Disney hired Stokowski to work on "Fantasia," and which reserved all rights in "Fantasia" to Disney, and the fact that until Stokowski's death, he and Disney acted as if Disney was the sole owner of the "Fantasia" copyright, we hold that no reasonable fact-finder could find for Muller on his joint authorship claim.

### 4. Common Law Copyright Infringement, Misappropriation, Conversion, and Unjust Enrichment

■ Muller asserts that by releasing "Fantasia" on home video, Disney has infringed Stokowski's common law copyright in the sound recording of the classical music in "Fantasia." As discussed above, the 1939 contract clearly provides that Disney owns all of Stokowski's work in the photoplay "Fantasia." Thus, Stokowski's common law copyright infringement claim fails as a matter of law. *See Bertolino v. Italian Line*, 414 F.Supp. 279 (S.D.N.Y.1976) (due to "crystal clear" contractual language giving away all rights to sound recording, the plaintiff had no common law copyright property interest to assert).

For the same reason, Muller's claims of misappropriation and unfair competition, conversion, and unjust enrichment also fail. These claims are all premised on the meritless claim that Disney violated Stokowski's ownership rights in releasing "Fantasia" on home video.

### 5. Breach of 1939 Contract Based on Advertising and Publicity

■ Muller claims that during the home video release of "Fantasia," Disney violated paragraph seventeen of the 1939 agreement, which provides that in all paid advertisement and publicity issued by Disney with regard to "Fantasia," Stokowski's name should appear the same size as "Walt Disney." Disney argues that this claim should be dismissed because Muller has not demonstrated any damages flowing from this alleged breach. While Muller counters that he could expect to present expert testimony that the limitations on publicity may have prevented there being increased sales of Stokowski's recordings of other musical works, we consider such a claim highly speculative. Moreover, no material evidence has been submitted to support this claim in opposition to Disney's motion, despite lengthy post-motion submissions from both Muller and Disney. Disney is entitled to summary judgment on this claim.

### 6. Lanham Act Claim

Muller claims that the home video release of "Fantasia" violated Section 43(a) of the Lanham Act, which provides for civil liability against "[a]ny person who, on or in connection with any goods or services or any container for goods, uses in commerce any word, term, name, ... false designation of origin ... or false or misleading misrepresentation of fact, which is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods...." 15 U.S.C. § 1125(a)(1).

The basis for this claim is Muller's contention that the 1939 contract did not authorize Disney to release "Fantasia" on home video, and thus the release, featuring Stokowski's name, might mislead people into thinking that Stokowski had approved the release. Since we have concluded that the 1939 contract authorized Disney to release "Fantasia" on home video without securing additional rights from Stokowski's estate, this claim must fail.

### 7. Royalties under Phonographic Record Agreement

█ Paragraph thirteen of the 1939 contract required mutual consent before any of Stokowski's recordings could be released on phonograph records. As mentioned above, in 1956 Stokowski and Disney entered into an agreement granting Disney the right to use "Fantasia" music in connection with the commercial sale of phonograph records, for which Disney agreed to pay Stokowski royalties. Muller contends that Stokowski's estate is due royalties from Disney's sales of "Fantasia" on home video under the 1956 agreement. However, home video cannot reasonably be said to be a species of purely audio technology, such as audio cassettes or compact discs. Disney is entitled to summary judgment on this claim.

### 8. Accounting

Muller contends that Disney owes it an accounting with regard to the phonographic records, audio cassettes and compact discs sold pursuant to or in the spirit of the 1956 agreement. Disney explained at oral argument that it thought this claim was only about home video, and that it was willing to talk to Muller about sales of purely audio recordings. We expect the parties to inform us within two weeks of the filing of this opinion whether they intend to continue to litigate this claim.

### 9. Muller's 56(f) Cross–Motion

Finally, we consider Muller's cross-motion pursuant to Rule 56(f), arguing that discovery on the issue of liability is not complete. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Muller argues that Disney has failed to comply with his discovery requests, by excessively redacting documents and withholding other documents. Disney contends that Muller is exaggerating its redactions and withholdings, and that its actions were in any event fully justified.

It is unnecessary to resolve this dispute. The overwhelming evidence for Disney and against Muller's claims, discussed above, cannot possibly be gainsayed by the evidence which Muller is seeking to discover, which consists of alleged communications among Disney employees who participated in the negotiations, and alleged remarks by Walt Disney describing Stokowski as a collaborator in "Fantasia." In other words, Muller has not shown that the documents he is seeking are "essential to justify [his] opposition," as required by Rule 56(f).

### CONCLUSION

Disney's motion for summary judgment is granted as to all claims except for Muller's claim for an accounting of sales of audio materials under the 1956 agreement. Muller's cross-motion under Rule 56(f) is denied.

**SO ORDERED.**